## Case No. 17,411.

### The WENONA.

[8 Blatchf. 499.] [1]

Circuit Court, N. D. New York. June 20, 1871.[2]

COLLISION BETWEEN STEAMER AND SAIL — PRESUMPTIONS — CHANGE OF COURSE BY SAIL—LIGHTS.

1. Under the rule which requires a vessel propelled by steam to keep out of the way of a sailing vessel, the mere proof that the former collided with the latter, unaccompanied by circumstances exonerating her, raises a presumption of fault in the former, which she must overcome or be condemned.

2. In this case, which was one of a collision between a steamer and a schooner, it was found that the schooner changed her course and thwarted prudent and proper movements which the steamer, on seeing her, had made, to avoid her, and that the schooner was in fault and the steamer was not in fault.

3. When a steamer sees the green light of another vessel directly ahead, it is nearly certain,

1 [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

2 [Reversing Case No. 17,410. Decree of circuit court reversed by supreme court in 19 Wall. (86 U. S.) 41.]

that, if both keep their courses, there can be no collision; and, in such case, starboarding by the steamer, out of abundant caution, though unnecessary, is not reprehensible. .

[Cited in The Excelsior, 12 Fed. 201, 203.]

4. Vessels approaching each other, and seeing the lights of each other, not only have a right, but are bound, to assume that the lights seen are properly set and screened.

[Cited in The Free State, Case No. 5,090.]

5. The location of the lights of the schooner, not approved.

[Appeal from the district court of the United States for the Northern district of New York.

[This was a libel by William T. Fraser against the propeller Wenona, William G. Fargo and others, claimants. From a decree of the district court in favor of libelant (Case No. 17,410), respondents appealed.]

John Ganson, for libelant.
George B. Hibbard, for claimants.

WOODRUFF, Circuit Judge. At about 9 o'clock in the evening of the 29th of November, 1869, the schooner Fremont, of which the libellant was master and owner, was on her voyage up Lake Erie, bound for Sandusky. Her course, by her compass, was south-west by west half west, with a six knot breeze from south or between south and south by east. It appears by the testimony, that she made some lee way, so that her movement in the water was somewhat more westerly than the line of her keel; and her speed was five or six miles an hour. At the same time, the steam propeller Wenona, from Chicago, bound for Buffalo, was coming down the lake, on a course, by her compass, east three quarters north, but the testimony is, that her compass varied, and that her true course was east by north half north, if it be assumed that she made no lee way; and her speed was about ten miles an hour. The two vessels came into collision, the schooner was sunk, the libel herein was filed by her master and owner, and, in the district court, he had a decree for the value of the schooner, her cargo, &c., from which the owners of the Wenona have appealed to this court.

The theories of the respective parties touching the manner and cause of the collision are in utter conflict, and the testimony of the witnesses, on some material points, cannot be reconciled. If full credence were to be given to all that is averred in the libel, and to what is testified by the witnesses for the libellant, it would seem that the schooner was in no fault; and yet their account of the transaction is so incredible, that, when met by the testimony for the claimants, the learned and experienced judge of the district court, as is manifest from his opinion herein, was constrained to reject the theory of the libel, and, to a large extent, that of the libellant's witnesses.

Under the rule which requires a vessel propelled by steam to keep out of the way of a sailing vessel, the mere proof that she collided with the latter, unaccompanied by circumstances exonerating her, raises a presumption of fault in the former, which she must overcome or be condemned. In this case, the claimants have assumed the burthen of discharging themselves, by showing that the Wenona did make proper effort, in the exercise of sound judgment and good seamanship, and that such effort was defeated by a change in the course of the schooner, in violation of the rule, which, while it imposed on the propeller the duty of keeping out of the way, with no less stringency required the schooner to keep her course, in order that the efforts of the propeller might not be defeated. This change of course the witnesses for the libellant deny; and their theory and statement of the manner in which the collision was caused by the propeller, is framed to account for the fact of collision consistently with the absence of such change.

Before bringing the testimony on either side to the test of credibility on this great point of difference, and, especially, before inquiring whether the propeller did, in fact, what it was her duty to do, it is of prime importance to ascertain the position and relation of each vessel to the other, when each was first sighted. This, I think, can be done by reference to facts that are not in dispute. When the propeller was first seen from the schooner, the mate of the schooner displayed a torch-light, which flashed for a very few seconds, and, very soon after, was re-lighted, and again displayed for other few seconds. The night was rainy, and a slight haze was above the water, so that this first flash light could be seen from the propeller before the colored lights of the schooner were visible. The light of the propeller first seen from the schooner was her white mast-head light, that also being visible before the colored lights of the propeller could be seen. The course of the schooner being south-west by west half west, (her actual motion in the water, by reason of leeway, being a little more westerly,) and that of the propeller east by north half north, their courses, by mathematical certainty, crossed each other at some point on the lake; and it is material to know where, in relation to these vessels. When the white mast head light of the propeller was first seen from the schooner, it bore a little on her starboard bow. The libel states it as nearly ahead. Her witnesses, however, state it as on her starboard or lee bow. The acts of these witnesses at the time prove that the propeller was seen to their starboard, for they exhibited their flash-light from and on their starboard side, aft, to signal to the propeller their presence. That side was the proper place for the exhibition of a torch-light to a vessel which was seen to starboard, and would not have been chosen for the exhibition of a light to a vessel seen to port. The libellant's witnesses from the schooner, who first saw the propeller's white light, are confirmed by their own impulsive contemporaneous acts, and, upon their testimony, I should regard the fact as established. It is, moreover, indirectly confirmed by the testimony of the witnesses from the propeller, in their observations upon the movements of the schooner.

On the other hand, the flash-light of the schooner was first seen one-half point on the port bow of the propeller. To this the testimony of those on the propeller is uniform; and there is nothing in the testimony of the libellant's witnesses which conflicts with it, but, as I think, it confirms it. From this it follows, without possibility of mistake, that the courses of the two vessels crossed each other at some point between the two. The vessels, on their respective courses, cannot be placed on the lake so as to be seen in the manner stated, unless those courses so crossed; for, if the schooner had passed the point of intersection, her flash-light must have been seen over the propeller's starboard bow, and, if the propeller had passed the point of intersection, her mast-head light must have been seen on the schooner's port bow. They were, therefore, at that time, approaching each other on converging lines, varying, however, from a parallel, less than one point, the propeller being to the starboard or leeward of the course of the schooner. They were about one and a half, or, possibly, two miles distant from each other. I think the proof shows the former distance most conformable to all the other facts. Next, the testimony of the witnesses from the propeller is uniform, that, shortly after the first flash-light of the schooner was seen, and before there was any change of course by either vessel, the green light of the schooner became visible. Some of the witnesses state that it bore slightly on the port bow. The master states his observation of it as directly ahead. Whether it was discerned through the haze a moment sooner by some than others, it is manifest that the schooner had then reached, or was on the verge of reaching, the point of intersection. The testimony of the mate and wheelsman of the schooner confirms this. The first flash-light was shown when the propeller bore on their starboard bow. After this flash-light, the colored lights of the propeller came into view. The schooner having reached the point of intersection, this would be true, and, as the green light is said to be visible a little further than the red, an instant would still elapse, when all three of the propeller's lights would be visible from the schooner, and the green light only of the schooner be visible from the propeller. This, I think, exhibits the position, and relative bearing, and actual relation, of the two vessels, before there is any ground to claim that either changed her course. The propeller bore a little on the starboard bow of the schooner, exhibiting to her all her lights. The schooner bore directly ahead of the propeller, (being at the point of intersection of the two courses,) exhibiting to the propeller her green light, and having, also, by closing in upon the port bow of the propeller, further shown, by her actual motion, that, though bearing ahead, she was crossing the propeller's bows.

The theory of the libellant is, that the schooner kept her course, but that the propeller passed to the port, or windward, side of the schooner, opening on her port bow, according to the testimony of her wheelsman,

three to four points, and perhaps more; of her cook, four points; of her second mate, two points; of her master, two and a half points; and of her lookout, one and a half points; and then bore down directly for the schooner, with all her lights in full view; and that, at the instant before collision, and when but a few feet distant, the collision appearing inevitable, the master, to ease the blow, gave an order "hard-a-port," but, before the schooner had time to swing more than a point, or a point and a half, at most, the propeller struck the bow of the schooner, angling forward, at less than a right angle between the sterns, and broke in the schooner, shoving her around, as is testified, and, at that moment, the schooner's sails gybed over to the other, that is, the larboard side. The testimony of the master is, that the main boom went over.

The case of the libellant, as testified to, makes this the explanation of the occurrence, and imputes this conduct to the propeller, as the fault on her part and the cause of the collision: The libellant himself, the master, declares, that the propeller appeared to be steering wild, and adds, "I mean, by getting to leeward, and then trying to cross to windward, crossing my bows twice, and, the second time, striking my vessel." The lookout, "They seemed to be gaining a little to windward * * * then seemed to be coming down on to us." The mate, "She appeared to haul to the windward of us * * * then he seemed to starboard his wheel, so as to shut in his red light, and opened his green light the second time, and, almost immediately after, we collided"; after the second torch went out, "she got on our port bow; she must have put her wheel a-port; she must have done it to get to windward of us * * * then she must have put her wheel a-starboard, to cross our bows." The wheelsman, "I could see her three lights, before she put off to windward; then she put off to windward sudden, and she got off to windward three or four points, and perhaps more * * * when she went to windward, she went sudden, and then she came sudden back." The cook, "When I saw the three lights, they were about four points to windward, bearing down on us." Apart from the contradiction of this supposed impeachment of the conduct of the propeller, there are several grounds for discrediting it. It is intrinsically improbable, and, in a conflict of theories, or of testimony, improbability is of some importance. It represents the propeller as having gone suddenly off her course, to the windward of the schooner, and, after passing so far as not only to have crossed the bows of the schooner, but far beyond any appearance of danger of collision, to have, without conceivable motive, changed her course in a direction pointing not from but towards the schooner, and run directly for her till they struck. I shall have occasion to suggest hereafter, that most of the appearances which lie

at the foundation of this testimony would be produced by a change in the course of the schooner; but, that the propeller was, in fact, guilty of the movements thus testified to, is to impute incredible folly, not to say insanity, to those who managed her, which passes belief. And, in view of the allegation that the schooner did not at any time, even to the actual collision, change, under the order "hard-a-port," more than one point, or a point and a half, or, as one witness states it, "half a point," this alleged manœuvre of the propeller grows still more incredible. For, if the schooner did not change till the instant of collision, she stood heading south-west by west half west, and a change of one and a half points would bring her only to west by south. The blow was angling forward, making an acute angle between the sterns, which one or more of the witnesses thinks forty-five degrees. To accomplish this, the propeller, on this theory of the libellant's witnesses, after passing the schooner to windward, must have come back, and, at the moment of the blow, have been headed north-west by west. Let any one place the vessels on a diagram, and suppose the propeller performing this achievement, and its utter incredibility will be manifest, unless a motiveless and wilful purpose to run down the schooner existed; or, if the angle of their sterns was more than forty-five degrees, say, nearly a right angle, say, six points, still this requires that the propeller should have changed to north-west by north, in pursuit of the schooner. And, once more, as bearing on the question whether these were the manœuvres of the propeller, or were appearances created by a change in the course of the schooner, taking the time of the occurrence most favorably for the libellant, on receiving the blow, the schooner's sails gybed, her main boom went over. Now, the witnesses for the libellant say the wind was south, and the schooner would lie within four points of the wind, but, that she might have "a good full," she was eased off half a point; and this is in precise accordance with their testimony, that her course was southwest by west half west. Her main boom and her sails, therefore, were within half a point of being as close hauled as she could lie to the wind, and they were off the starboard quarter. As above stated, at the moment of the blow, her witnesses state that she had not fallen off more than one or one and a half points, which would have changed her course only to west by south. Now, it is clear, that, before the wind could strike in upon the other side of the sails, and throw the main boom over to the port side, she must be turned around more than ten points—I think, at least, as much as twelve; and this the claim of the libellant requires us to believe was forcibly accomplished by a blow angling forward, so that the sterns made an acute angle, and accomplished while a six knot breeze was blowing full against her sails, and resisting such a turn. Besides this, unless the

vessels instantly separated, the stern of the propeller would itself have prevented so great a turn; and, in view of the evidence, that the main sheets were loosened and let off four or five feet, before the blow, the difficulty is rather increased. On the theory that the schooner had previously changed her course, all improbability disappears.

I have no hesitation, then, in saying that the account given by the libellant and his witnesses is, on the grounds stated, very incredible, apart from its conflict with the testimony from the propeller, and that a mode of accounting for the collision, which should be consistent and natural, especially if it accorded with the weight of the testimony on both sides in nearly all the particulars, would be better entitled to credit.

The opinion of the learned judge of the district court shows, that he entirely rejected the theory that the propeller first ported, went off to windward, and then, after she had passed clear of the schooner to windward, till either two or four points on her port bow, changed her course and came back on her own course, or partially so, heading for the schooner; and yet, without this theory, the case made by the libel, and by the libellant's witnesses, fails, and it becomes necessary to construct a new case, and convict the propeller of fault widely different from that alleged or attempted to be proved.

I cannot resist the conclusion that the propeller was in no fault whatever. This unquestionably involves the conclusion that the schooner did improperly change her course, and defeat the efforts made by the propeller to avoid her; and it requires that one, and possibly two, of the libellant's witnesses be somewhat discredited, in respect to that change of course. But, as to the others, what they saw was judged of without actual knowledge, and by appearances which that very change of course produced; and the residue of the testimony, some discrepancies of time and distance, generally uncertain, excepted, is in harmony with my conclusion. In view, then, of the considerations already suggested in regard to the case, on the testimony from the schooner only, and, next, in view of the consistent account given by the witnesses from the propeller, harmonizing not with the inferences of the libellant's witnesses, but with most of the observations which they made and testified to, I am constrained to believe that the schooner made the improper and unfortunate change of course which caused the collision.

First, then, as to the conduct of the propeller, as shown by her witnesses. Beginning with the position of the vessels, as shown without contradiction, and first above detailed, the propeller saw a torch-light a little over her port bow. About two minutes elapsed, and she saw the schooner's green light very nearly if not dead ahead. Here was nothing doubtful. The indication was clear, and the succeeding moments confirmed the necessary in-

ference, the inference which her captain actually drew, namely, that, on some course, and on some angle, greater or less, that vessel was in the act of crossing his course, to his starboard. Otherwise, she could not have so closed in on his bow. Otherwise, too, it was not possible to see her green light, if properly screened, and in proper position, which he was bound to assume. There was, therefore, no apparent danger of collision. With a green light ahead, it would pass by, even if he did nothing to make its avoidance more certain. But the lines of approach might be very nearly coincident. It could possibly do no harm to make a slight sheer to port, and open that green light on his starboard bow a little. It would apparently make collision impossible; and he did it. Out of abundant caution, he did what was not strictly necessary, but what it was eminently safe to do. This was not a fault. The moment after he gave the order, and, I think, before the propeller could have felt her helm effectively, the second flash light, followed by the further observation of the green light on his starboard bow, showed that he had judged correctly, and was clear of all conceivable danger, if the schooner kept her course. Nor did he act too soon. There was no reason for delay. It was enough that he had seen the flash light, waited two minutes, and then seen the green light crossing his course. What should he wait for? If it is answered, that he should have waited, on a conjecture that possibly the schooner might change, the answer is—he knew it was the duty of the schooner not to change her course, and he not only had a right, but was bound, to assume, in his conduct, that she would not. It is not true that he had not seen her position and learned her course; and it is most palpable, that, if he had delayed, and, especially, if he had ported, and a collision had ensued, he would have been utterly without excuse. More than this, he did what, under the circumstances, it was right to do. The actual course of the schooner, and the opening of her green light on his starboard, prove it; and it is not a fault that he did what in truth it now appears it was right to do, even if he did it sooner than was necessary.

Nor does the suggestion, that it was the sheer of his own vessel to port, under a starboard helm, that made the light of the schooner open on his starboard bow, change the conclusiveness of his reasoning. The propeller's going to port did not change the color of the light he had just seen ahead, or slightly on his port bow. It was green still; and opening it, by steering a little to port, only made it more certain that it would pass by, and equally as certain as if he had waited and seen it open by its own motion. If it did not open, it might seem to be stationary. So long as it was green, he might be safe in making no change; but he must be more surely safe by sheering to port. Going to starboard would have been the plainest want of seamanship, and a gross violation of the rules of naviga-

tion. Shortly after this sheer of the propeller, after observing the green light of the schooner opening on his starboard bow, he sees a change. The red light of the schooner appeared. It requires no reasoning to show, that his own change to port could not bring that light into view. Then, and only then, was there danger of collision, and then he did what must be regarded as presumptively the safest thing. He put the helm hard a-starboard, instantly. To have then ported, would presumptively have been running, on a swing from a starboard wheel to a hard a-port, directly into the schooner's head. It became a question of judgment, whether to instantly stop, or to hasten the propeller's motion to port, in the hope of clearing the schooner. To stop, might, before it could be completely effected, bring the schooner down upon her. Stopping by the screw of a propeller is not accomplished without some side-wise motion; and he judged a hard a-starboard helm to promise best for safety. But, almost immediately, he saw that his effort to escape by advancing was futile, and he then did his utmost to stop and back, diminishing thereby, as much as he could, the force of the blow. My conviction is clear, that the propeller's conduct, in all this, was skilful, and without negligence or fault. It may be possible, that if, after he saw the red light, he had ported, the vessels would have cleared; but even that is not free from doubt, even in the light now derived from a retrospective view of the transaction and its results.

How, then, did the vessels come together? I answer, the schooner improperly changed her course, and defeated a proper, and the only proper, effort of the propeller to avoid her. Whether there was more than one order given on the schooner to port the helm, or the one order was given when there was no excuse for it, or whether the wheelsman, from bad judgment or carelessness, suffered her to fall off, may be uncertain; but it is a significant circumstance, that the second mate of the schooner testifies positively that the captain of the schooner "gave orders to the man at the wheel to hard-a-port; it was after the second torch went out, and at the same instant." This was almost at the same instant that the propeller starboarded; and, in this view, what becomes of the suggestion that the propeller starboarded too soon, having the schooner's green light in view? The proof shows, rather, that the propeller had starboarded just as, or immediately before, the second torch was lighted, which was one or two seconds before the order to change the course was given on the schooner. I am aware that this statement of the second mate of the schooner is not in exact harmony with inferences drawn from the testimony of other witnesses on the schooner; but, if it were profitable, it would be easy to point out very many discrepancies in their testimony, and, on a question of the time when the schooner changed her course, made doubtful by conflicting statements, such ex-

plicit testimony from an officer of the schooner is of some significance. Unquestionably, the interval between the order and the time when the schooner fell off so as to show her red light to the propeller, made their proximity dangerously near when that red light was discovered from the propeller. Whether the second mate is accurate or not, the schooner having been in a position to show her green light after the second torch went out, and the propeller having starboarded and begun to sheer to port, all danger of collision, if there was any before, had ceased; and yet the schooner did exhibit her red light, which could not be done without a change of her course. I suggest here, also, that the propeller cannot be located on her conceded course, with the green light of the schooner in view, and. thereafter, by starboarding, bring the red light of the schooner into her view, unless, in fact, the schooner does change her course. This, of itself, and of necessity, establishes fault in the schooner, and in the schooner alone, unless we go back, in utter discredit of all the witnesses from the propeller, and take up the theory that the propeller had first ported, gone off to the windward of the schooner, and then turned almost back upon her course, in pursuit of the schooner, and deny wholly, that, when she starboarded the green light of the schooner was in view; for, obviously, the moment the propeller should get to the windward of the schooner, the red light of the latter, and not the green, would alone be visible, and that over the propeller's port bow.

Much of the testimony of the witnesses from the schooner as to what they saw is in no serious conflict with the view I have taken of the conduct of the propeller, or of its propriety. Their inferences were based on the assumption, that the schooner did not change her course till it was too late to avoid the collision. The observations to which they testify are, most of them, consistent with the testimony from the propeller, saving, always, discrepancies among themselves, already alluded to. Those who first saw the propeller's white light, saw it over their starboard or lee bow. When they reached the point of intersection of the two courses, where they showed their green light to the propeller, they must see, and did see, all three lights of the propeller, the green appearing, through the slight haze, a little before the red. Passing a little beyond this point of intersection, and changing her course by falling off, the three lights would seem to them to go to windward; and the second mate says, that, after the second torch light went out, he saw the propeller's masthead and green lights, plainly indicating that then the propeller had, as her witnesses testify she had, starboarded, and was on her sheer to port; and the master of the schooner, also, when he came up, saw her green and masthead lights. True. they several of them say, that the green light disappeared, and the propeller's red and white lights alone remained; but this was shortly before the collision, and the short turn of the schooner, on a helm hard-a-port, might produce that effect; and, when the propeller made a final struggle to avoid collision, by putting her helm hard-a-starboard, that would again bring her green light into view, as the libellant's witnesses say it was seen. It is quite certain, that there are some statements of the libellant's witnesses that cannot be harmonized with my conclusion, and no less true, that their testimony cannot be harmonized among themselves. It is in such contradiction on the point, how far the propeller seemed to them to get to their starboard, as almost to warrant a suspicion that it did not so appear at all; and the testimony of the master is so inconsistent with itself, as to create an apprehension that much that he said was supplied to him by a strong desire to place the propeller in the wrong, rather than by his memory of what he saw.

It is with great hesitation, and not until after the most careful and repeated examinations of the testimony, that I reverse the decree in this case, upon a conclusion of fact adverse to that of the district court; and yet, the view which was there taken of the course of the propeller, seems to me necessarily to require it, for it was not there deemed proved that the case stated by the libellant, or by his witnesses, could be sustained. The propeller did not go off to windward, then turn aside, and nearly backward, and run down the schooner. If not, then she did see the green light of the schooner ahead, and a sheer to port could not be improvident or negligent. The schooner could not get to her but by a change in her own course.

It is not material that I should say anything in regard to the place where the lights of the schooner were set. Without reference to them, I deem the collision the fault of the schooner. But I would not leave the impression that such a location of the lights is approved. On the contrary, I deem it a failure to comply with the statute, and, of itself, a gross fault. The bowsprit and its rigging are greatly liable to hide lights placed just above the deck, forward. very near the bow. The master himself does not, in his testimony, state that they are at all above the height of the rail immediately in front. His language on that point is very guarded. If this fault prevented the changes in the course of the schooner being sooner seen, which is quite possible, then this, also, contributed to the collision. But, if not. then the case rests upon the other grounds assigned for reversing the decree.

Let a decree be entered dismissing the libel, with costs.

[On appeal to the supreme court, the decree of this court was reversed. and the cause remanded, with directions to affirm the decree of the district court. 19 Wall. (86 U. S.) 41.]