## THE EXCELSIOR.

*(District Court, S. D. New York.* April 25, 1882.)

1. COLLISION—INSUFFICIENT LOOKOUT.

A schooner sailing in the Hudson river at night with a free wind, with no other lookout than the captain remaining abaft of the wheel, *held*, no proper and sufficient lookout.

2. SAME—STEAMER WITH TOW—HEAD ON—FAILURE TO EXHIBIT TORCH-LIGHT.

A schooner approaching a steam-tug with a tow nearly head on, must be held in fault in not exhibiting a torch-light, according to section 4234 of the Revised Statutes, unless it be clear that exhibiting a torch-light would convey no additional information as to her course and position, which cannot be assumed where, as in this case, there is reason to believe that the schooner's red light was obscured by her jibs.

3. SAME—CONFLICTING TESTIMONY—IMPROBABILITIES.

Where there is irreconcilable conflict of testimony as to the positions and courses of two colliding vessels, the account given from the vessel having no lookout properly stationed, being in part improbable in itself, is discredited.

4. SAME—FAULT BY CHANGE OF COURSE.

Where orders are given for a change of course by a schooner just prior to a collision, in the excitement occasioned by the sudden discovery of a steamer near at hand, from the want of a previous proper lookout, and the change of course contributes to the collision, the schooner must be *held* in fault.

5. SAME—NOTICE OF EXCEPTIONAL MOVEMENTS.

Where the steam-tug A., with the barge E. in tow upon a hawser, was proceeding up the Hudson river, and saw the schooner's green light about a point on her starboard bow, which, instead of broadening further to starboard as they approached, constantly made up more towards the stem of the steam-tug, that is, to windward, but no red light was seen, *held*, sufficient notice to the steam-tug of something exceptional about the schooner's course or lights, with the probability that she was constantly yawing to windward and was nearly head on, with her red light either extinguished or obscured, and that the steam-tug was bound to give her, therefore, a wide berth. The steam-tug, instead of doing so, having kept on her course unchanged, nearly head on, until, when the green light was a little off the starboard bow, the schooner ported and ran across the steamer's course, resulting in a collision with the barge, from which the schooner was sunk, *held*, that the steam-tug was liable for not keeping further out of the way, and that the damages should be apportioned.

6. OBSCURATION OF LIGHTS.

The captain of the barge, though having some steerage way, is not primarily answerable for her navigation, and not held with the same strictness to keeping watch of lights ahead; and not knowing on which side of the steam-tug the schooner, whose lights he had seen ahead, would pass, *held*, that he was not answerable for negligence in not noticing the schooner's lights for two or three seconds as she passed to port, and before they were enveloped and obscured by a cloud of steam, and not liable for not at that time immediately porting his helm.

*Benedict, Taft & Benedict* and *S. H. Valentine*, for libellants.

*James McKeen*, for steam-tug Atlas.

*Butler, Stillman & Hubbard* and *W. Mynderse*, for barge Excelsior.

BROWN, D. J. This is an action for damages for the loss of the schooner Warren Gates through a collision with the steam-tug Atlas and barge Excelsior, about 11 o'clock on the night of September 26, 1878, on the Hudson river, at a point about two miles north of Yonkers, whereby the schooner was immediately sunk.

The Warren Gates was a small schooner of about 73 tons measurement, 68 feet in length, and 24 feet beam. She was deeply laden with a cargo of about 425 tons of coal, having 25 tons on deck, on a voyage from Rondout, New York, to Niantic, Connecticut. She was coming down about the middle of the river, the wind a strong breeze from N. N. W., on her starboard quarter, with foresail and mainsail well out, both jibs set, and making from six to seven miles an hour. The tide was the last of the flood.

The Atlas, a steam-tug of 68 feet in length and 17 feet beam, was going up about the middle of the river, with the barge Excelsior in tow,

on a hawser 55 fathoms in length. The barge was 143 feet long by 23 feet wide, and was about half loaded, drawing four feet of water. All the vessels had the regulation lights properly set and burning. The tug passed the schooner to the right, but, as the libellants claim, struck her a somewhat severe glancing blow upon the port bow of the schooner, though this is denied by those on board the tug. The main-boom of the schooner, about 50 feet long, raked across the tug, carried away the top of her pilot house, broke the steam-whistle, bent the smoke-stack, and, it is said, became somewhat entangled in her upper works. She soon cleared, however, and shortly after the barge struck the port bow of the schooner nearly head on, in consequence of which the schooner sank in about three minutes. Her captain was carried down with her, but was rescued by the tug. The cook was drowned. The mate and one seaman, who were the only other persons on board the schooner, were afterwards rescued by another vessel.

The night was dark but clear. Each claims to have seen the lights of the other from one and a half to two miles distant. Shortly before the collision the wheel of the schooner was put first nearly to star-board, and then hard a-port, when, as alleged in the libel, a collision seemed unavoidable from a sudden change of course in the steam-tug; and there is no doubt that as the tug passed her the schooner bore somewhat to westward; for, when raised a few days afterwards, she was found heading one or two points to the west of the line of the river. But, as to all the time prior to this change of the schooner's wheel, the testimony of the parties, both as to the situation of the two vessels and their respective courses, is in irreconcilable conflict.

Upon the schooner the mate was at the wheel, and there was no other lookout than the captain, who had charge of the navigation. He remained abaft the wheel, claiming that on account of the spray from the bows it was a better situation for a lookout that night. He testified that he first saw the vertical white lights of the Atlas when two miles off, as he stood by the rail on the starboard quarter, and that these white lights were then seen between the two masts beneath the fore boom on his port side. Shortly after, he says, he went to the rail on the port quarter, and presently saw the red light of the Atlas about on a line with the port rail of the schooner; that it was three or four minutes after having seen the white lights that he first saw the red light of the Atlas about a point on his port bow, and that he kept watching it from that time on; that a short time after —two minutes, more or less—he saw the green light still on his port

bow; that he then apprehended a collision, and ordered the wheel put hard a-starboard, but that before there was time to starboard the wheel the steamer's red light came again suddenly in view, when he ordered hard a-port, and took hold of the wheel to help, and that he had hardly time to give the order hard a-port before the collision. On his cross-examination he says that he first saw the colored light when he was standing on the lee side, and saw the red light parallel with the lee rail, and that when he saw the green light he was in the same place, and saw it in the same direction; that up to the time of seeing the green light his course was not changed, but that they came down the middle of the river as straight as the schooner could be steered.

The mate, who was at the wheel, testified that he first saw the white lights on his port bow twelve or fifteen minutes before the collision; that three or four minutes afterwards he saw the steamer's red light about one point off his port bow, which remained in sight may be seven or eight minutes; that up to that time he had made no change at all in the course of the vessel, but sailed straight down the middle of the river; that she would yaw about three-quarters of a point upon either side; that he next saw the green light when three or four lengths of the schooner (about 250 feet) distant from the steamer, and that this green light bore a little on his port bow, when he got the order hard a-starboard, and before it was hard up he got the order, "The red light in sight again; hard a-port;" that he saw the red light himself the second time; that there was no interval to speak of between the order to starboard and the order hard a-port, and between the order hard a-port and the collision was a very short time—about half a minute, or a minute at the most.

The seaman who was below, off duty, was attracted on deck by hearing the captain sing out, "A light on the lee bow." He threw away his pipe, came on deck and went forward, and says he saw the red light from a point to a point and a quarter on the lee (port) bow; that it remained in view about five minutes; that he then saw both lights, and in two or three seconds saw the green light, when the tug was about five lengths of the schooner away (350 feet) and pretty near ahead; that he next saw the tug's red light; that the collision was so soon after that he had to "fly out of the bows;" that the tug hit the schooner on the port bow, a pretty heavy glancing blow, and that the barge struck less than half a minute afterwards, square on.

From all the surviving witnesses of the schooner, therefore, the testimony is uniform that the lights of the tug and tow were at all

times upon the schooner's port bow, and that the tug's red light, and not her green light, was visible until within three or four lengths of the schooner, when, by a sudden change, the steamer's green light was seen, threatening an immediate collision, when the schooner's helm was changed as a maneuver *in extremis* to ease the blow.

The testimony of the pilot and captain of the steamer is directly to the contrary. The pilot testifies that he first saw the lights of the schooner about two miles off, a little on his starboard bow, but could not at first make out which lights they were; that her course was zigzag till about one mile distant, when she showed a green light only on his starboard bow; that she kept on that course till her green light was about two points off on his starboard bow, when he could see her sails plainly at a distance of 400 or 500 feet, more or less, when she changed her course, shutting in her green light and showing her red light only; that at that time the schooner was so far upon his starboard bow that he could see the easterly shore of the river abaft the schooner; that if she had not changed the steamer would have passed some 500 feet to the west of her, and that upon her porting her helm he put his own helm hard a-port to avoid her; that the hull of the tug did not strike the schooner, and that he dropped down as the main boom raked over the tug, and on getting up found her headed right on to the easterly shore; that prior to porting his helm he was heading about one point to the westward of the line of the river; that he did not previously change his course at all after first making the schooner's lights, and that he was three-quarters over towards the easterly shore; that there was no other person on deck excepting the captain, who was lying down in the pilot-house when the lights were first seen, and got up almost immediately thereafter; and that the pilot-house was 15 feet from the stem of the tug.

The captain testified that the tug was going up the middle of the river, as near one side as the other, and heading straight up the river; that he first saw the schooner's green light, from one to one and a half points off his starboard bow, three-quarters of a mile away; that the green light remained in view about three or four minutes, when it was shut off and the red light became visible when about 300 feet off from the tug; that had the schooner kept on without this change she would have passed 100 feet clear to starboard; that at the time of this change he could hardly see the hull of the schooner, but could see her sails; that the tug's helm was immediately put hard a-port, and that the hull of the tug did not strike the schooner. On-

his cross-examination he repeatedly stated that the green light, after being first seen on the starboard bow, did not broaden off more to starboard, but approached the stem; and that the red light, when first seen, was nearer the stem on the starboard bow than the green light when first seen. On the redirect he stated that the schooner "seemed to be coming for us all the time;" but he afterwards said that the green light, after being first seen, did broaden off on the starboard bow, and that no flash-light was shown by the schooner.

Both the captain and the mate testified that the captain of the schooner, when he got aboard the tug, stated to them that he ordered his wheelsman to put the wheel to starboard, but that the mate, instead, put it the wrong way, hard a-port. This was denied by the captain of the schooner.

The tug and tow were going with the tide at the rate of about seven knots, and the schooner at about an equal speed, so that they were approaching each other at the rate of about 14 miles per hour, or a mile in a little over four minutes, or about 1,250 feet per minute, and 20 feet per second.

It is impossible that these two accounts of the positions and courses of the respective vessels can both be correct. If the schooner's green light was seen, as stated, upon the steamer's starboard bow only, up to within a minute of the collision, it is impossible that the steamer's red light should have been seen at all, up to that time, by those on board the schooner, much less upon the schooner's port bow, as sworn to by those on board the schooner. Neither vessel had any proper lookout, properly stationed. That a master in charge of the navigation, standing abaft of the wheel, is not a proper lookout, has been often adjudged. St. John v. Paine, 10 How. 585; The Ottawa, 3 Wall. 268; The Nabob, 1 Brown, Adm. 115; The Genessee Chief, 12 How. 462-3. Testimony to that effect was given upon the trial; and the statement of the captain, that the spray thrown up by the vessel forward rendered the after-part of the vessel a better place for observation, cannot be accepted. The seaman who came up and went forward just before the collision, in my judgment did not come on deck at the time he said he did, some five minutes before the collision, but, as the master testified, only shortly before, when the shouts caused by the impending danger attracted his attention. He came up, not on duty, but for his own safety, and too late to be of any service in the navigation of the schooner. So the steamer, likewise, had only the pilot and the captain in the pilot-house, and these have been repeatedly held not to constitute a proper lookout.

*The Nabob,* 1 Brown, Adm. 115, 124; *The Ottawa,* 3 Wall. 268; *The Catharine,* 17 How. 177.

The want of a proper lookout, it is true, is immaterial, if it in no way contributed to the accident, (*The Farragut,* 10 Wall. 334; *The Fannie,* 11 Wall. 238, 243;) but the question here is whether the lights visible from the one vessel to the other were in fact correctly seen and noted; and whether the witnesses, in the accounts they give, did see what they now profess to have seen. The presence or absence of a proper lookout, and the position of the witnesses, and the probabilities of correct observation, are of the greatest importance, where the accounts given are irreconcilable.

The position of the captain and pilot in the pilot-house of the steamer, within 15 or 20 feet of her bows, would be for the most part as favorable for observation as the position of a lookout proper upon the deck forward; and yet it is not impossible that the red light of the schooner, if hidden by her jibs from the pilot-house, might at some moments have been visible from the deck. But the position of the captain of the schooner abaft of the wheel cannot be admitted for a moment as a proper position for a lookout, when sailing full and free with a strong wind, and in case of a conflict of testimony observation reported from such a position must be deemed partial, interrupted, and incomplete, and entitled to far less weight than that of a lookout properly stationed. The changes of the lights of the steamer, as he testifies they were seen from the schooner just before the collision, could not, in my judgment, have been caused, as he alleges, from any corresponding changes in the course of the steamer during the very short period of time in which they are said to have occurred. He says the steamer changed from red to green, and back again from green to red, followed immediately by the collision, and all so quick that the two orders, first to starboard his wheel and then hard a-port, could not be fully executed in the interval of these changes. It is impossible that the steamer, encumbered by a tow, could have swung first one way and then the other, so much as to change these lights in so short a space of time. The changes are wholly denied by the captain and by the pilot of the steamer, who say that the only change they made was that of a port wheel after the schooner's last change, viz., putting her wheel hard a-port, and any such repeated changes by the steamer as alleged by the captain of the schooner are in themselves highly improbable. *The Wenona,* 8 Blatchf. 499, 504.

The testimony of Lutz, the seaman, relied on to confirm that of the master, I do not accept, because I think he came up on deck and went forward at the time of the excitement occasioned by the apprehension of an immediate collision. The libellants' account, therefore, of what preceded and led to the collision, cannot, in my judgment, be relied on.

The testimony and circumstances, taken all together, lead to the conclusion that the vessels were approaching each other, from the first, nearly head on; that the schooner was a little to the eastward of the steamer in the river, upon a general course directed nearly straight downward, but yawing considerably on each side, but more to windward, and thus making up continually towards the stem of the steamer, as the captain of the latter testified; and that the steamer was heading very nearly directly up the river. This is confirmed by the testimony of the captain of the barge, who testifies that he saw both lights of the schooner directly ahead, half a mile distant, and that she came down so nearly head on that he could not tell on which side of the steamer she would pass. The captain and the pilot of the steamer do not admit seeing the two lights of the schooner at that distance, but only the green light, and it is suggested that the red light was obscured by the schooner's jibs. The two lights of the steamer should at the same time have been visible upon the schooner, and, in my judgment, would have been seen by a lookout upon her bow. It is quite likely that the captain, as he testifies, saw, while standing by his starboard-quarter rail, the steamer's vertical white lights a good deal upon his port side, when the schooner was yawing extremely to windward; and that, on account of the distance of the light to port, he did not keep any subsequent watch upon it; that the steamer's lights were more or less obscured by the schooner's sails, and that it was not until they were close upon her that either the steamer's red or green light was seen; that the sudden and unexpected appearance of these lights in succession—first the red and then the green light—led to the shouts of hurried and confused orders, startled the seaman off duty below and brought him on deck, and that the apparent changes of the steamer's lights were only such as he successively saw in the moments of excitement, which did not permit of his ascertaining the true course and bearing of the steamer, and led to a hasty and improper change of course.

The testimony of the captain and mate of the steamer can be sufficiently relied on, I think, to show that the schooner was some-

what upon the tug's starboard bow, so that it is impossible to say that the schooner's change of course did not contribute to the collision. If any change of course by the schooner was justifiable, it was only by starboarding the wheel, and not by porting.

The failure of the schooner to show a torch-light, as required by section 4234 of the Revised Statutes, must also be held to be a fault in this case which contributed to the collision. There is no reason to doubt the testimony of the captain and pilot of the steamer that they saw the schooner's green light for a considerable time before the collision. Their failure to see the red light also, which was seen by the captain of the tow and which must have come into view more or less, can only be accounted for by gross neglect in observation, or else by the red light being for the most part obscured by the schooner's jibs. The relative situation and courses of the vessels were such that such obscuration is quite possible. Had the captain of the schooner, or any proper lookout, been forward and seen the situation of the steamer, he would have known that this was possible, and would have been bound to take precautions against it. *The Wenona,* 8 Blatchf. 499, 512; *The Vesper,* 9 FED. REP. 569, 574. The exhibition of a torch-light in such a case would have put the steamer upon her guard, and repaired in a measure the misleading effect of the obscuration of the red light. The case is therefore within the decisions in the case of *The Eleanora,* 17 Blatchf. 88, 101–2, and in *Craw-ord* v. *The Niagara,* 6 FED. REP. 910; since it is impossible for the court to say that the exhibition of a torch-light would not have conveyed additional information to the steamer for avoiding the collision, (*The Alabama,* 10 FED. REP. 394;) and it is only where it clearly appears that the exhibition of a torch-light could not have served any useful purpose, or given any additional information as to the position or course of a sailing-vessel, that the omission to comply with section 4234 can be held to be immaterial. *Schooner Margaret,* 3 FED. REP. 870; *The Leopard,* 2 Low. 241; *Kennedy* v. *The Sarmatian,* 2.FED. REP. 911; *Waring* v. *Clarke,* 5 How. 441, 465.

The schooner was therefore in fault for not keeping a proper lookout, and for failure to exhibit a torch-light; and her change of course was in the wrong direction and contributed to the collision.

I think it must also be held that the tug was in fault in not having a proper lookout, and in not taking any steps seasonably to keep out of the way of the schooner. The testimony of the pilot, that the schooner was so far to the eastward that the tug without change of

course would have passed 500 feet clear of her, is not, I think, to be relied on. His account of the situation differs materially from that given by the captain, and both differ from that given by the captain of the tow. The local rules required the steamer to be upon the easterly side of the river. The pilot says she was three-fourths over, while all the other witnesses say she was in the middle of the river. The pilot says that the green light of the schooner was broadening off on his starboard bow as she approached. The captain, on his direct examination, said that the red light, when it first appeared, bore one-half a point on his starboard-bow, and was about 300 feet off; and on his cross-examination he said repeatedly that the green light was continually approaching the stem, instead of broadening off, from the time when he first saw it, three-quarters of a mile distant, till the red light appeared, and that the schooner "seemed to be making for us all the time;" and he estimated, on direct examination, that he would have cleared the schooner, if she had not ported, by 300 feet, but on cross-examination put it at 100 feet only, instead of 400 or 500, as testified by the pilot; while the captain of the tow, who saw both her lights, says she came so near head on that he could not tell on which side she would pass. The pilot says he was not watching her lights all the time; and had the schooner been so far to the eastward as the pilot testifies when she first showed her red light, i. e., so as to pass from 400 to 500 feet clear, and being at that time only 300 feet off, it is incredible, no matter how suddenly the captain of the schooner may have been surprised on first seeing the steamer's colored lights, that he should have ported and ran far out of his course across the steamer's bows; nor, in that situation, could the steamer's colored lights have failed to have been seen much earlier. *Haney v. The Baltimore*, etc., 23 How. 291; *The Carroll*, 1 Ben. 290. Just how soon the captain of the steamer got up to observe the lights is an open question. He says he first saw the green light three-quarters of a mile off, one to one and a half points on his starboard bow; that this light drew up to within half a point of his stem. When 300 feet distant the green-light was shut in and the red light came suddenly in view; yet, though the schooner was so near, and coming so nearly directly upon her, the steamer took no steps whatever to keep out of the way. Whether, therefore, regard be had to the testimony of the captain of the tow, who saw both lights, or to that of the captain of the steamer, who says he saw only the green one, and that one continually drawing nearer to the stem of the steamer, I think it clear

that he took no such seasonable precautions to avoid the schooner as is incumbent upon a steamer, even with a tow. *The Favorite,* 9 Fed. Rep. 709; *The Nabob,* 1 Brown, Adm. 115.

Where there is plenty of sea-room, a steamer encumbered by a tow is for that very reason bound to take early precautions to give a sailing-vessel ample margin for passing.

The evidence in this case shows that for a considerable period before the collision the vessels continued to approach each other nearly head on, at the rapid rate of nearly 14 miles per hour; yet the steamer made no change in her course till after the schooner's red light appeared, some 10 to 15 seconds only before the collision; while if both the schooner's lights were not seen, but only the green light, in consequence of the red light being obscured by the jib, nevertheless, the failure of the schooner to haul more to starboard under the green light exhibited, as would naturally have been expected, and the fact that she drew up continually in the opposite direction, which I think is proved, notwithstanding the captain's final modification of his testimony, was sufficient to apprise the captain of the steamer of some exceptional circumstances in the situation which required him to keep well off, and also to sound signals of alarm, neither of which was done. His final change of helm, just before the collision, was sufficient probably to avoid much injury to the schooner by the steamer itself, but ineffectual to save the tow from colliding with and sinking her.

As respects the barge it is claimed by the libellants that she might easily have avoided the collision by porting her helm; and that, being some 50 fathoms astern of the steamer, had she done so the collision between the tug and the schooner must have been avoided. All the witnesses, however, agree that the steamer's whistle was broken off as she was raked by the boom of the schooner, and that the immediate escape of steam was so great as completely to obstruct further observation. The captain of the tow testifies that as soon as he saw the schooner coming down on the port side he immediately ported his helm, and did what he could to avoid her, and that he did not previously know on which side of the steamer she would pass. It would seem that there must have been two or three seconds—evidently not more than that, considering the combined speed of both vessels—when, if he had been on the strict watch, he might have seen the light of the schooner as she passed to the port side of the steamer before the escape of steam had obstructed the view; but as the captain of the tow was not primarily responsible for the navigation, nor

bound to keep a strict and constant lookout for vessels ahead, I think he is not chargeable legally with knowledge, against his own testimony, for what he might have seen during the short space of two or three seconds; and that his failure to notice this momentary appearance of the schooner's light on the port side before it was obscured by the escape of steam, which might, if it had been seen, have led him to port his helm sooner, is not legally chargeable against him as negligence; and there being no other fault chargeable against him upon the evidence, the collision of the tow with the schooner must be charged to the fault of the steamer, which was responsible for her navigation.

The libel should be dismissed as against the Excelsior, with costs, and the libellants should have judgment against the Atlas for one-half their damages, with costs, with a reference to compute the damages.

---

## THE A. R. GRAY.

### (*Circuit Court, E. D. New York.* May 27, 1882.)

COLLISION—TUG AND TOW—FICTITIOUS DAMAGES.

Where a boat was towed out of a crowded slip stern foremost by a tug, and was drawn against the bow of a canal-boat lying in the slip, the owner of which libelled the tug and claimed $1,000 damages for the collision, and on the trial the damage proved was a crack in the bow-stem of the canal-boat so struck,—to repair which perfectly at the present time it might be necessary to take out the stem and rebuild the bow,—while the claimant of the tug brought many witnesses to show that the crack was a "season check," the effect of weather and not the result of collision, and could have been drawn together with bolts at the time at a trifling expense, *held*, that the libel must be dismissed, on the evidence, with costs against the libellant.

*T. C. Campbell,* for libellant.

*W. W. Goodrich,* for respondent.