NEWMAN (TURNER v.). See Case No. 14,-262.

NEWMARK (UNITED STATES v.). See Case No. 15,870.

———

## Case No. 10,178.

### The NEW ORLEANS.

District Court, S. D. New York. May 25, 1877.

## Case No. 10,179.

### The NEW ORLEANS.

[8 Ben. 101.] [1]

District Court, S. D. New York. May. 1875. [2]

COLLISION AT SEA — STEAMER AND SCHOONER — LOOKOUT—CHANGE IN EXTREMIS—BURDEN OF PROOF—PRESUMPTION OF NEGLIGENCE.

1. A steamer and a schooner came in collision on the morning of September 6th, 1874, at sea, off the coast of New Jersey. The schooner was sailing northeast by north, the wind being east-south-east, when the steamer, which was steering about south by west half west, was seen about two or three miles off and about two points and a half on the schooner's port bow. The schooner kept her course till the steamer was about three lengths, or about 800 feet, distant. The schooner's second mate then hailed the steamer, and, getting no answer, told the man at the schooner's wheel to let her luff half a point, and the man ported his wheel just before the vessels struck. Both vessels had their lights set and burning, and it was, moreover, so light that the vessels themselves could be seen at an ample distance. The lookout on the steamer had been sent from his post by the second mate, who had charge of the deck, to help wash the decks, the only lookout from that time being the quartermaster at the wheel, in the wheelhouse, with the windows closed. The schooner was not seen till her hail was heard by the second mate, who then saw her over the steamer's starboard bow, about 850 feet distant. The steamer was running ten miles an hour. The second mate then went to the pilot-house and ordered the steamer's wheel put hard-a-port, and her engine was stopped by the captain, who had been asleep and was awaked by the second mate's order to the quartermaster. The porting of the steamer's helm changed the steamer's course but very little. She struck the schooner on her port bow. cutting half-way into her: Held, that the fact of a collision under the circumstances of this case was evidence of great negligence somewhere.

2. It being the duty of the steamer to avoid the schooner, the presumption of negligence was on the steamer. and it was for her to relieve herself from the burden.

3. The steamer was in fault in not having seen the schooner sooner.

[Cited in The Ancon, Case No. 348.]

4. That the porting of the schooner's helm was a movement in extremis, brought about by the fault of the steamer in approaching so near the schooner, and was not to be attributed as a fault to the schooner.

5. That the steamer was liable for the collision.

In admiralty.

Henry J. Scudder, for libellants.

John E. Parsons, for claimants.

BLATCHFORD, District Judge. This is a libel filed by the owners of the schooner Allie Bickmore to recover for the damages sustained by them through a collision which occurred between that vessel and the steamer New Orleans, on the morning of the 6th of September, 1874, at a little after five o'clock.

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court. Case No. 17,-353a. Decree of circuit court affirmed by supreme court. 106 U. S. 13.]

The schooner was bound from Fernandina, Florida, to New York, with a cargo of lumber, and the steamer was bound from New York to New Orleans. The collision occurred in the Atlantic Ocean, off the coast of New Jersey. The libel alleges, that, prior to and at the time of the collision, the schooner had all her sails set, and was steering north-east by north, with light winds from the east south-east; that the steamer was seen at a distance of three miles, and, when within a mile of the schooner, the bell of the latter was rung and her crew shouted to the steamer to keep off; that the steamer paid no attention to such signals, but bore down on the schooner and struck her on the port bow, cutting half into her, and said schooner immediately filled with water, and would have sunk but for her cargo; and that the collision occurred through the negligence of the steamer and without fault on the part of the schooner.

The answer avers that the steamer was sailing on a course nearly opposite the course of the schooner, and was in charge of a competent master and with sufficient crew, who were attending to the discharge of their duties; that the schooner, when first seen, bore on the starboard bow of the steamer, and was heading in a direction opposite to that of the steamer, and such that, had the two vessels continued their respective courses, they would, by an ample distance, have cleared each other; that, when the two vessels had approached to within a few lengths of each other, the schooner ported her helm, so as to pass directly across the course of the steamer and in front of her bow; that, as soon as this movement was seen from the steamer, the steamer was slowed, her wheel ported, so as, if possible, to pass astern of the schooner, and her engines then stopped, but that it was impossible then to prevent the collision, and the steamer struck the schooner on her port bow, cutting a considerable distance into her side; that the steamer did all that was in her power to prevent the collision, and the same was caused by the improper navigation of the schooner, in changing her course across the steamer's bow; and that, when the schooner undertook to cross her bow, all that the steamer could do to prevent the collision was to stop and to port her helm, which was done, but that it was impossible then to prevent a collision.

The schooner had her lights set and burning, the weather was clear, there was already so much of daylight that the schooner herself could be seen, irrespective of her lights, at an ample distance, the wind was light, and the schooner was making but slow progress though the water. Under these circumstances the fact of a collision is evidence of great negligence somewhere. It being the duty of the steamer to avoid the schooner, the presumption of negligence is on the steamer, and it is for her to relieve herself from the burden. She has undertaken to show that she would have avoided the schoon-er but for the movement of the schooner by porting, which brought the schooner suddenly across the bow of the steamer, when otherwise the schooner would have passed safely on the starboard side of the steamer.

Great negligence is shown on the part of the steamer in not having discovered the schooner sooner than she did, and in not having had a lookout stationed at a proper position at the bow of the vessel, and vigilant in the discharge of his duty. At the approach of day the lookout who had previously been stationed forward was withdrawn, the officer of the watch and his men were engaged in washing the decks, they were none of them in a position to see ahead, and the duty of looking out for approaching vessels was confided to a quartermaster, who was alone in the pilot-house engaged in steering the vessel, and who had the glass windows in front of him closed. This quartermaster has been examined as a witness for the libellants. The pilot-house in which he was, was on the upper deck, on the forward house, just before the foremast. The quartermaster testifies that he saw nothing of the schooner until the second mate, who was the officer of the watch on deck, came into the pilot-house and directed him to put the helm hard-a-port; that the second mate assisted in porting the wheel; that the captain then came from his room and rang two bells and stopped the steamer; and that the steamer swung to starboard, by the porting, three-quarters of a point from south by west half west, before she struck the schooner, that having been her course for some time previously, so that, when she struck the schooner, she was heading south-west by south three-quarters south. It also appears from the testimony of the quartermaster, that, as soon as the second mate gave him the order to port, he looked up and saw the schooner over his starboard bow, heading across his bow. The vessels at that time were very near each other. The quartermaster says they were not more than three ship's lengths apart. In a statement given by him to the claimants' proctor, eleven days before, he had said that they were about five of the steamer's lengths apart.

The master of the steamer, also, was sworn as a witness for the libellants. He says he was aroused from sleep by the second mate to the quartermaster to put the wheel hard-a-port; that he was sleeping in a berth in his room abaft the pilot-house, on the same deck, a door from the rear of the pilot-house opening into his room; that he sprang up, and, without waiting to put anything on, went into the pilot-house, and saw the schooner directly ahead or a little on the starboard bow, about three or four of the steamer's lengths off; and that he immediately pulled the bell to slow, and took hold of the wheel to help port it, and then pulled a bell to stop, and watched the schooner's red light, putting it in range with the window of the pilot-house, to see if the

steamer answered her helm, but saw very little change in the course of the steamer before the two vessels collided. He further says that the steamer was a vessel of between 1,400 and 1,500 tons burthen; that she was running, at the time, at the rate of about eleven and one-half miles an hour, which was full speed; and that, by ringing to slow, stop and back, she could not be stopped, from full speed, in a distance of less than a quarter of a mile, which is a little over six and one-third times her length.

The only other witness from the steamer who was examined was the second mate, who was examined for the claimants. He testifies, that, at twenty minutes before five o'clock, it being then daylight, he called the lookout away from the topgallant forecastle to help wash the decks, and told the quartermaster in the pilot-house to keep lookout. His attention was first called to the schooner by hearing some one call out "Steamer, ahoy!" This was a cry from the schooner. He ran to the starboard side of the steamer and looked over the rail, and saw the schooner a little on the starboard bow and three and a half of the steamer's lengths off, or about 850 feet. This was a space over which the steamer, at a speed of ten miles an hour, would pass in less than one minute, allowing nothing for any movement of the schooner towards the steamer.

Here, then, on the concurrent testimony of these three witnesses from the steamer, we find her rushing at this speed, with no proper lookout, and, in full daylight, approaching within 850 feet of the schooner before discovering that there was a vessel in her way, and then notified of the proximity of the schooner by a cry from that vessel. This was negligence sufficient to cause the collision, and, presumptively, was the cause of it.

But it is claimed that the schooner ported her helm and threw herself into the path of the steamer.

The second mate of the steamer testifies, that, when he looked over the rail on the starboard side of the steamer and saw the schooner a little on his starboard bow he saw a light on the schooner, one light, and noticed that it was her green light; that he then went up the steps on the starboard side to go to the pilot-house; that, when he got up the steps, he looked at the schooner again, and saw that she bore about three-quarters of a point on his starboard bow, and that she had altered her course from the time he looked at her over the rail, and had shut in her green light, and was heading nearly across the bow of the steamer; that he noticed all this before he gave the order to hard-a-port; and that the steamer changed her course, by the porting, from a quarter to a half of a point, before the collision. On cross-examination he says, that, when he looked at the schooner, after getting up the steps, she was three of the steamer's lengths off. He

makes the change in the schooner's course, to have taken place when the schooner was between three and three and a half lengths of the steamer off—that is, between 735 feet and 858 feet. It is satisfactorily established, by the evidence, that the steamer's stem struck the schooner on the port bow of the schooner, and cut into her at an angle of about from eighteen to twenty degrees with the line of the keel of the schooner. As the steamer's course, at the blow, was south-west by south three-quarters south, and the direction of the blow was the same as such course, the course of the schooner at the time of the blow must have been, as nearly as possible, a course a point and three-quarters to the eastward of north-east by north three-quarters north—that is, northeast. The second mate of the steamer admits that, when he first saw the schooner, she was heading about half a point on to the steamer. He makes the course of the steamer at that time to have been, by the compass, south by west half west, and says that the course of the schooner at that time was north-east by north. If the course of the schooner was north-east by north, and the course of the steamer was south by west half west, the schooner was heading a point and a half on to the steamer, instead of half a point. If the course of the steamer was south by west half west, and the schooner was heading half a point on to the steamer, the course of the schooner was north north-east. In either case, the course of the schooner was a course drawing on to the course of the steamer and not drawing away or diverging from it. Under such circumstances, any porting of the helm of the schooner, resorted to at the distance off given by the second mate of the steamer, was a movement in extremis, brought about by the fault of the steamer in approaching so near to the schooner, and not to be attributed to the schooner as a fault. On the facts testified to by the second mate of the steamer, and with the speed of the steamer, and the positions and proximity of the two vessels, there would have been a collision, even if the schooner had not made such a change as the second mate of the steamer testifies to.

This view as to the time when the change by the schooner was made is confirmed by the testimony of the second mate of the schooner, who was the officer of the watch on her deck at the time. He testifies, that he was aft, when the man on the lookout reported a steamer; and that he then went forward and saw the steamer about two or three miles off, about two points and a half on the port bow of the schooner. He gives the course of the schooner as north-east by north, and this agrees with the testimony of the first mate of the schooner. The second mate of the schooner further says, that the steamer was coming for him, and that, when she was about three of her lengths off, he hailed her. This was the hail which attracted the attention of the second mate of

the steamer. He also says that he got no answer; that the steamer was then close to him; that he then told the man at the wheel of the schooner to let her luff half a point; and that then the vessels struck. It required a luff of only a point to bring the schooner so as to head north-east. She probably did, at the time, luff a point, and this accords with the testimony of the witnesses from the steamer.

In so far as there may be anything in the testimony of Oberg, the man at the wheel of the schooner, or of Potter, the steward of the schooner, which militates against the foregoing conclusions, such testimony is unreliable. The course of the schooner being north-east by north, or even, as Oberg puts it, north north-east half east, it is impossible to believe that the steamer was seen over the starboard bow of the schooner, at any time, and equally impossible to believe that the second mate of the steamer, when at first he saw a light, and only one light, on the schooner, saw her green light and not her red light.

This is a clear case for the application of the rule announced in the case of The Carroll, 8 Wall. [75 U. S.] 302, that fault on the part of a sailing vessel at the moment preceding collision does not absolve a steamer which has suffered herself and such sailing vessel to get into such dangerous proximity as to cause inevitable alarm and confusion, and collision as a consequence; and that the steamer, as having committed a far greater fault in allowing such proximity to be brought about, is chargeable with all the damages resulting from the collision.

There must be a decree for the libellants, with costs, with a reference to a commissioner to ascertain and report the damages.

[NOTE. Upon the report of the commissioner, a final decree was entered for the damages found in favor of the libellants. From this decree the claimants appealed to the circuit court, which affirmed the decree in this court. Case No. 17,353a. Thereafter the libellants moved for summary judgment against the sureties upon the appeal bond, which motion was denied, as having been made prematurely. Case No. 10,181. From the decree of the circuit court affirming the district court, an appeal was taken to the supreme court. Here, likewise, the decree against the vessel was affirmed. 106 U. S. 13.]