THE WARRIOR.

S. H. HARMON LUMBER CO. et al. v. THE WARRIOR.

(Circuit Court of Appeals, Ninth Circuit. January 30, 1893.)

No. 57.

TOWAGE—STRANDING OF TOW.
Where on trial of a libel against a steam tug for damages caused by the stranding of a schooner upon a bar while in tow of the tug, the evidence as to the schooner's draft, and the depth of water at the time of stranding is conflicting, a finding by the district court that the schooner was in fault will not be disturbed on appeal.

Appeal from the District Court of the United States for the Northern District of California.

In Admiralty. Libel by the S. H. Harmon Lumber Company and others, owners of the schooner Sailor Boy, against the steam tug Warrior, (the Wilmington Transportation Company, claimant,) for damages to the schooner, caused by stranding. Decree for libelee. Libelants appeal. Affirmed.

E. W. McGraw, for appellants.

Page & Eells, for appellee.

Before GILBERT, Circuit Judge, and KNOWLES and HAWLEY, District Judges.

GILBERT, Circuit Judge. On January 5, 1888, the steam tug Warrior undertook to tow the schooner Sailor Boy from the roadstead off San Pedro to a berth inside the bar. While crossing the bar the schooner was stranded, and suffered damage. The libel charges that the injury was caused by the negligence of the master of the tug in attempting to tow her over the bar at a time when the tide was ebbing, and the water was insufficient in depth; that the master of the schooner informed the master of the tug that the schooner's draft was 14 feet 6 inches. The defense is that the master of the schooner did not correctly state his draft; that his draft was 15 feet, instead of 14 feet 6 inches; that there was sufficient water for a vessel of the draft as represented, but not sufficient for a vessel of the actual draft of the schooner. The decision on appeal, as in the court below, depends upon the preponderance of the evidence as to the draft of the vessel and the depth of the water upon the bar. The testimony is conflicting upon both these issues.

The draft of the schooner was measured and marked upon her rudder posts up to 13 feet, but no further. The captain of the schooner at the time she grounded was making his first voyage upon that vessel. Both he and the mate of the schooner testify that her draft at that time was 14 feet 6 inches, but it appears that their knowledge was derived from hearsay only. The mate admits that his information was obtained from Capt. Mitchell, a former captain of the schooner. Mitchell testified that he had "carried over forty cargoes in her;" and that when she is loaded down to within 3 inches of the top of her rudder post, her draft was 14 feet 6 inches. It was evidently in consequence of this information derived from Mitchell that the captain of the schooner, who had no knowledge of his own upon the subject, stated to the captain of the tug that his draft was 14 feet 6 inches. He also said to the captain of the tug, after the accident, according to the evidence of the latter, that the vessel was loaded to within 3 inches of the top of her rudder post. The captain of the tug soon afterwards made measurements up to 3 inches below the top of the rudder posts, and found the distance to be 14 feet 11¼ inches, instead of 14 feet 6 inches. He also measured up to the dark line on the schooner's side, and, assuming that to be

her water mark when loaded, he made her draft to be 15 feet 1 inch. The accuracy of these measurements is not disputed. It is claimed, however, that by actual test upon a subsequent voyage it was shown that with 395,000 feet of lumber (30,000 more than she carried on this voyage) the schooner's draft was only 15 feet 1 inch, and that upon discharging 30,000 feet of her cargo the draft was reduced to 14 feet 6 inches. The value of this test is to some extent impeached by the fact that at the time of the voyage on which the injury occurred the season was wet, both while the schooner was loading at Gray's Harbor and while on her voyage of 13 days from there to San Pedro, and that the lumber which she was engaged in transporting from Gray's Harbor was at that time in active demand, and was shipped green, and as soon as sawed. These conditions were to a large extent changed when the test voyage was made. It was proven that on some of her voyages 400,000 feet of lumber would load her down no more than would 360,000 feet at other times, the difference resulting from the condition of the lumber, whether wet or dry. A careful consideration of all the testimony convinces us that the preponderance of the evidence is in favor of the conclusion reached by the learned district judge, that the draft of the schooner was misrepresented to the tug, and that the schooner's actual draft was about 15 feet.

The preponderance of the evidence also indicates that at the time the schooner struck there was sufficient water on the bar to allow a vessel drawing 14 feet 6 inches to have passed over with safety. The captain of the tug testifies that on crossing the bar a few minutes before he returned with the schooner, he sounded and found the lowest water to be 16 feet 4 inches. High water was at 2 o'clock. According to the master of the tug, who looked at his watch, the schooner struck at 2:05. Another witness took the time after he heard the distress whistle of the tug, and found it to be 2:15. Others estimate the time to have been 2:15, 2:20, 2:30, and one places it as late as 2:45. It does not seem to us material whether it was 2:15 or 2:45. The evidence shows that in the first 45 minutes after the turn of the tide at that time and place the water ran out slowly, and the fall was slight, probably not to exceed two inches. The depth of water on the bar, as found by the tug master, is corroborated by the soundings of the coast survey engineers. Mr. Von Geldern, of the United States engineer corps, places the depth on the bar at high water on that day at 15 feet 7½ inches. His estimate was given from soundings made by him in his official capacity in May, 1887, when the depth was found to be 11.2 feet at low water, and in June, 1888, when the lowest water was 11.8 feet. He thought it reasonable to infer that the increase of depth between these dates must have been gradual, and that in January, 1888, the depth at low water was 11.5 feet. This, with the added depth at high water, which is conceded to be 4.1 feet, would give a depth at high water at 2 o'clock on the day of the accident of 15.6 feet. It is contended that there is no evidence to support the assumption of Mr. Von Geldern that the increase from May, 1887, to June, 1888, was continuous or grad-

ual. It seems to us, however, a not unreasonable assumption, and it has some support in the sounding taken by Capt. Melberg. The only evidence to contradict it is the evidence of Capt. Welt, the port pilot, who testified that at high water on that day the depth would be a little over 15 feet. If we assume that Capt. Welt's measurement is correct, and adopt the very lowest estimate given of the water on that day, there is still nothing in the evidence to convince the court that at 45 minutes past 2 o'clock a vessel drawing 14 feet 6 inches could not have crossed the bar in safety.

In this case the most of the evidence was taken before the district judge, and it would seem to be a proper case for the application of the rule that on appeal in admiralty from the district court, where questions of fact are involved depending upon conflicting testimony, the decision of the district judge, who has had the opportunity of seeing the witnesses, hearing them testify, and judging of their credibility, will not be reversed unless clearly against the weight of evidence. The Sampson, 4 Blatchf. 28; The Sunswick, 5 Blatchf. 280; The Thomas Melville, 37 Fed. Rep. 271; The Albany, 48 Fed. Rep. 565. The decree of the district court is affirmed, with costs to the appellees.