## THE CAPTAIN WEBER.

### (Circuit Court of Appeals, Ninth Circuit. October 3, 1898.)

### No. 436.

1. COLLISION—REVIEW ON APPEAL—FINDINGS OF FACT.
   Where the evidence on an issue as to which vessel was in fault in a collision was taken in open court, the finding of the district court will not be disturbed on appeal unless clearly against the weight of evidence.
2. SAME—STEAMER AND SAILING VESSEL—BURDEN OF PROOF.
   Under the rule which requires steamships to keep out of the way of sailing vessels, a steamer is not relieved of such duty by the fact that a sloop approaching from an opposite direction on a river also has machinery operated by a naphtha or gasoline engine as an auxiliary power, and the steamer is prima facie liable for a collision, and can only relieve herself by showing that the accident was inevitable, or that it was caused by the culpable negligence of the sloop.
3. SAME—EVIDENCE OF FAULT.
   A collision occurred between a steamer and a sloop going in opposite directions on a river the channel of which was about 1,200 feet wide,

and the usual course of steamers about the middle. The water was nearly slack, and the night calm and clear. *Held*, that evidence showing that the steamer had no proper lookout, and that the collision took place not more than 150 feet from the bank, and probably much less, warranted a finding that the steamer was in fault.

Appeal from the District Court of the United States for the Northern District of California.

This was a libel for damages for a collision, by Joseph Prada against the steamer Captain Weber,—the Union Transportation Company, claimant. From a judgment for libelant, the claimant appeals.

Reddy, Campbell & Metson, for appellant.

Milton Andros, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This was a libel to recover damages growing out of a collision between the steamer Captain Weber and the sloop Ida, upon the alleged ground that the "collision was brought about and occasioned solely by the negligent, careless, and unskillful manner in which the steamer was navigated and managed by those in charge of her navigation." This the respondent in the court below (appellant here) denied, and, on the contrary, alleged that the collision was "occasioned solely by the negligent, careless, and unskillful manner in which the sloop Ida was navigated." The district court found that the steamer was solely in fault, and entered a decree for the libelant, from which the claimant brings the present appeal, the ground of which is that the court should have found the sloop solely in fault.

The evidence was given in open court, and is substantially conflicting. The well-settled rule in such cases is that the decision of the district judge, who has had the opportunity of seeing the witnesses, hearing them testify, and judging of their credibility, will not be reversed unless clearly against the weight of evidence. The Alejandro, 6 C. C. A. 54, 57, 56 Fed. 621; The Sampson, 4 Blatchf. 28, Fed. Cas. No. 12,279; The Sunswick, 5 Blatchf. 280, Fed. Cas. No. 13,625; The Thomas Melville, 37 Fed. 271; The Albany, 48 Fed. 565; The Warrior, 4 C. C. A. 498, 54 Fed. 534; Duncan v. The Gov. Francis T. Nicholls, 44 Fed. 302; Taylor v. Harwood, Taney, 446, Fed. Cas. No. 13,794. An attentive reading and consideration of the evidence in the case not only fails to satisfy us that the findings of the trial court are against its weight, but we think the probabilities of the case, as well as the presumptions growing out of the facts, support the conclusions reached by the court below. The steamer was plying between the cities of San Francisco and Stockton. Its tonnage is 501.91; length, 175.5 feet; beam, 36.5 feet; and she draws 8 feet of water. The sloop's tonnage was 14.74; her length, 39.05 feet; beam, 16 feet; and draft, 4.4 feet. The sloop carried a mainsail and jib, and also had auxiliary power in the form of machinery operated by naphtha or gasoline. The collision occurred between 1 and 2 o'clock in the morning of September 3, 1894. For some reason, not appearing, the testimony in the case was not taken for nearly 3½ years

thereafter, which fact probably accounts for some of the inconsistencies and discrepancies appearing therein. At the time of the collision the steamer was proceeding on her voyage up the San Joaquin river to Stockton, and the sloop was on her way down the river to San Francisco. The point of collision was near Pittsburg Landing. Where it occurred the river is about 1,200 feet wide, the channel extending practically from bank to bank. It appears from the evidence, without conflict, that the usual course of the steamers plying on that river is to follow the middle of the channel, leaving, at the point where the collision in question occurred, about 600 feet of water on each side. Just prior to the collision the steamer was following this usual course. Between the steamer and the sloop as they were approaching each other was a bend in the river, and across that bend the sloop discovered the masthead light of the steamer when they were about a mile apart. The steamer did not discover the sloop until the distance had been lessened to about a quarter of a mile, when the witnesses on behalf of the steamer say that they first saw the starboard light of the sloop, then almost immediately the port light, and then again almost immediately the starboard light; from which it is earnestly contended on behalf of the appellant that the sloop was tacking, first one way and then another, and that by such careless and bad navigation the sloop crossed the bow of the steamer, and thereby caused the collision. This contention is conclusively negatived by the fact that when the steamer struck the sloop, which she did amidships, and on the starboard side, the sloop, according to witnesses on behalf of the steamer, was only from 100 to 150 feet from the southerly bank of the river, and, according to the witnesses on behalf of the sloop, but from 10 to 12 feet from that bank. The bow of the steamer cut through the sloop, and forced her into the bank. The mere fact that the steamer left her usual course up the middle of the channel, and approached to within less than 150 feet of the southerly bank, strongly suggests fault on her part. If she had kept her course, there could have been no damage; and if she had wanted to change it because of the sloop's lights which she saw on the southerly side of the river, there were nearly 600 feet of water on the northerly side of the stream within which to move, and avoid any possible collision. The night was clear and pleasant, the tide on the ebb, and the water nearly slack. There was so little wind that the sloop had gone in close to the south bank of the river to anchor, and wait for more favorable conditions of tide and wind. There is no room for doubt as to the fact that she was close to the bank, and out of the way of the steamer, for she was rammed into the bank by the steamer. Not a witness put the distance of the sloop from the bank at the time she was struck at more than 150 feet. It was the duty of the steamer to keep out of the way of the sloop; for, certainly, the fact that the latter was provided with auxiliary steam power did not make her a steam vessel at the time of the collision in question. The provision of the act of congress of August 19, 1890, that "the word 'steam-vessel' shall include any vessel propelled by machinery," has no application here, for the reason, if for no other, that that act did not go into effect until July 1, 1897. 29 Stat. 885, 893. That the steamer

was required to keep out of the way of the sloop is settled, not only by repeated adjudications, but by statute as well.    Article 15 of the regulations for preventing collisions on the water (13 Stat. 58, 60) declares:

"If two ships, one of which is a sailing ship and the other a steamship, are proceeding in such directions as to involve risk of collision, the steamship shall keep out of the way of the sailing ship."

In The Carroll, 8 Wall. 302, 305, where a collision between a steamer and schooner was under consideration, the supreme court said:

"The steamer was required to keep out of the way, slack her speed, or, if necessary, stop and reverse, while the schooner was required to maintain her course, and was not justified in changing it unless advised to do so to avoid a danger that immediately threatened her.    As the steamer did not keep out of the way, and as the collision did occur, the steamer is prima facie liable, and can only relieve herself by showing that the accident was inevitable, or was caused by the culpable negligence of the schooner."

See, also, The Wenona, 8 Blatchf. 499, 500, Fed. Cas. No. 17,411; The Oregon v. Rocca, 18 How. 570; Steamship Co. v. Rumball, 21 How. 372; The Fannie, 11 Wall. 238; The New Orleans, 8 Ben. 101, 103, Fed. Cas. No. 10,179; Spencer, Mar. & Coll. § 93.

The presumption thus raised by the law against the steamer is strengthened by the fact that she had no proper lookout at the time of and immediately preceding the collision.    The claimant's witness Cunningham testified that he was the pilot of the Captain Weber, and in charge of the vessel at the time of the accident, and he was asked these questions:

"Q. Were you in the pilot house of the Captain Weber at the time of this accident between the Captain Weber and the sloop Ida?  A. I was.  Q. Was there any lookout on duty at that time,—at the time of the accident?  A. We had the watchman outside the pilot house.  Q. Who was he?  A. His name was Albert Hanson.  Q. Where is he now?  A. He is dead."

A "watchman outside the pilot house" is not a lookout on the forecastle, where a lookout should be.    That there was no lookout at the place where he should have been appears from the testimony of the appellee's witness Bevis, from which we extract the following:

"Q. What is your business?  A. I was watchman of the steamer Captain Weber on the night of the 2d of September.  Q. 1894?  A. 1894; yes, sir. Q. Did you see the sloop Ida that night?  A. I did; yes, sir.  Q. At what place on the Captain Weber were you when you first saw the Ida?  A. On the bow of the Captain Weber.  Q. Just tell the court what you saw, and what occurred after you first saw the Ida on that night.  A. As we were nearing Pittsburg, or around the bend below Pittsburg, I went over to go down and clean the machine, and I saw the sloop Ida coming down the river. I watched her to see what she was going to do.  She was on the port tack, showing her starboard light at that time; then she came around on the starboard tack, and showed us her port light; then she came back on the port tack again, and showed us her starboard light; and by that time we were close in to the bank, about 150 or 200 feet from the south shore."

On cross-examination he was asked:

"Q. You say you were watchman on the Captain Weber.  Were you on the lookout?  A. I was on the bow at the time of the accident.  Q. You say you were watchman.  I want to know if you were lookout.  A. No, sir;  I was not.  *  *  *  Q. Did the Captain Weber have a lookout on this occasion?  A. Yes, sir; he was on her bow.  Q. How long had he been there?  A. About

ten or fifteen minutes. Q. Were you stationed there on the bow? A. No, sir; not all the time. Q. Was there any lookout on? A. Yes, sir; there was a lookout on at that time. Q. Where was he stationed? A. I could not tell you. Q. Was he on the forecastle head when you were there? A. He was not on the forecastle head when I was there; no, sir. Q. Do you know how long he had been away from the forecastle head? A. No, sir; I don't know anything about it."

It seems quite clear to us from the record that the steamer mistook the position of the sloop as well as her own. At all events, the appellant fell far short of showing that the accident was caused by the culpable negligence of the sloop, or that it was inevitable. The judgment is affirmed.