## THE CHARLES HEBARD.

### THE CHARLES HEBARD v. LYONS.

(Circuit Court of Appeals, Sixth Circuit. June 7, 1893.)

#### No. 51.

COLLISION—TUGS AND TOWS—ST. CLAIR RIVER.

The steamer H. was passing down the St. Clair river at night, in the southeast bend, with three schooners in tow. She was running very slow, because she had been notified that a raft was just ahead. The raft was from 1,800 to 2,000 feet long and 250 to 300 feet wide, and was in tow of a small tug on a hawser. When discovered by the H. the starboard side of the raft at the tail end was about the middle of the river, which was here 700 feet wide, while its tug was hugging the Canadian side. The H. discovered, about the same time, the tug A. coming up on the American shore, with two schooners in tow. She blew a danger signal, and then ex-

changed signals with the A. Having but a moment to decide, her master determined to pass on the American side. The H. passed the corner of the raft, and then starboarded, and followed close down its side, but, being notified that her hawser was fouling the raft, again slowed, but shortly went ahead on a signal that the line was free. She passed the A., as did also her first tow, but her second and third tows collided with the tows of the A. The A. and her tows had gone aground just before the collision. Two experts testified that the safer and prudent course for the H. would have been to take the Canadian shore. *Held*, that the H. was in fault, first, for taking the American side, and, second, for slowing, so as to lose control of her tows, at the critical moment. 46 Fed. Rep. 137, affirmed.

Appeal from the District Court of the United States for the Eastern District of Michigan.

In Admiralty. Libel in rem by Stephen H. Lyons, executor of the estate of Daniel Lyons, George Goble, J. H. Jacobs, and Joshua Reynolds, against the steamer Charles Hebard, her engines, etc., the claimants filed a cross libel against the American Eagle, the Monticello, and the Westside. There was a decree for libelant in the court below, (46 Fed. Rep. 137,) and the claimants appealed. Affirmed.

William A. Moore and William V. Moore, for appellants.

Harvey D. Goulder, for appellee.

Before JACKSON and TAFT, Circuit Judges, and SAGE, District Judge.

SAGE, District Judge. This is an appeal from a decree of the district court of the United States for the eastern district of Michigan, in admiralty, holding the propeller Charles Hebard liable for a collision of the schooners Watson and Scoville, of her tow, with the schooners Westside and Monticello, in tow of the tug American Eagle, in the southeast bend of the St. Clair river, about 12:30 of the morning of July 18, 1888. The libel was filed by the owners of the Westside and Monticello against the Hebard. A cross libel was filed by the owner of the Hebard against the American Eagle, the Monticello, and the Westside. The case was tried before Judge Hammond, who heard it under designation by Judge Jackson, and filed an opinion, reported in 46 Fed. Rep. 137, holding that the Hebard was solely in fault for the collision.

The Hebard, a propeller of about 1,000 tons burden, and 200 feet long, was coming down the river with the Wilson, the Watson, and the Scoville in tow, in the order named. They were attached by lines of about 600 feet between the Hebard and the Wilson, and about 500 feet between each of the other vessels, making the length of the entire tow about 2,000 feet. The Hebard was laden with oats, and the vessels of her tow with lumber. The night was dark, but lights could be clearly seen. The wind was moderate, from the eastward. The "Southeast Bend," as it is commonly called, is in the St. Clair flats, at the mouth of the St. Clair river. The land on both sides of the river is flat and low, and from the canal the entire bend can be seen. The Hebard and her tow had been coming down the river with the current, at between seven and eight

miles an hour. About midnight she reached the Canadian club-house, at the beginning of the southeast bend, and about two and one-half miles above the place of the collision. When near the clubhouse, she passed, port to port, a tow bound up, and was hailed, and notified to look out for a raft being towed down the river. The captain of the Hebard, who was on watch, immediately went to the pilot house, checked her speed, took his marine glasses, and looked for the raft, but could not see it. There was on deck the usual watch,—the captain, second mate, lookout, and wheelsman. The Hebard came down, all looking for the raft.

The appellants' version of the facts is that shortly after check-ing the speed of the Hebard, the tail of the raft was discovered about 500 feet ahead, and it was also discovered that the light, instead of being at the end, where it should have been, was forward about one-third the length of the raft, which was from 1,800 to 2,000 feet long and from 250 to 300 feet wide, (appellees say 250,) and attached to a small tug by a line of about 500 feet. It was passing around the lower end of the bend, with the tug near the Canadian shore, and the tail of the raft about the middle of the river, which is there some 700 feet wide. Before he got sight of the raft, the captain of the Hebard saw the lights of the Amer-ican Eagle and her tow, and exchanged a signal of two blows from the whistle. On discovering the raft, the Hebard checked again, and blew several short blasts with her whistle as a signal of danger. Having but a moment to decide, the cap-tain determined—the starboard side of the raft being in about mid-channel, and the tug around the bend, close to the Cana-dian bank, so that there did not appear to be more than 300 feet of clear water down the raft on the Canadian side—to pass on the American side, and by his order, almost immediately after the exchange of signals with the American Eagle, the wheel of the Hebard was put to port and she came off about three-quar-ters of a point. She was then running under a double check. Com-ing on down, she passed between the American shore and the tail of the raft, and as close to the raft as she could, and keep clear of it. As soon as she cleared the tail of the raft, she put her wheel a-starboard. Just then the captain was hailed from the Wilson to slow up, as the line was getting foul of the raft. The Hebard was then checked the third time. Shortly afterwards word was passed that the line was free, and the signal to go ahead was given. When the Hebard passed the tail of the raft, the American Eagle was coming up, close into the American shore, and showing her green and white lights. The Hebard passed her and her tow just below the tail of the raft, at a distance of from 75 to 100 feet. The Wilson also passed, at a little less distance. The Watson passed the tug, but her lumber caught an anchor hanging over the star-board bow of the Westside, the first vessel in tow of the Ameri-can Eagle, dragged the anchor out with its chain, cutting away the stanchions, and doing some damage. The Watson passed on down the river until the chain pulled her up, which brought her into collision with the Monticello, the second vessel of the Ameri-

can Eagle's tow.   The Scoville, the last vessel of the Hebard's tow, passed the tug all right, but came into collision with the Westside, and the American Eagle, the Westside, and the Monticello then all went aground.

The appellees, whose version of the facts differs materially from the appellants' in almost every essential particular, place their reliance upon the following considerations: Their claim is that their tug and tow grounded before the collision.   The fact of the grounding is not in dispute.   The question is when it occurred. The tug drew about 8 feet of water, and each vessel of her tow about 12 feet.   The line from the tug to the Westside was about 500 feet, and from her to the Monticello about the same.   The tug was not in the collision.   That she grounded first is established by the fact—shown by undisputed evidence—that the Westside ran up to within 150 feet of her before grounding.   The vessels lay in those positions until the tug worked herself off the next morning, and then pulled the Westside off.   This fact conclusively negatives the claim of the appellants that the appellees' tug and tow were moving up the river until stopped by the collision.   It is not possible that the Westside, after being struck by the Watson, a larger and heavier vessel, and then by the Scoville, both heavily laden, and moving down the river, ran up the river about 350 feet towards the tug, and there grounded.   The force of the blow from each of those vessels was down the stream, and must at least have stopped the upward motion of the Westside.   It is to be kept in mind that, according to all the testimony on that subject,—appellants' as well as appellees',—appellees' tug was not struck by the Hebard or any vessel of her tow, and the appellants' testimony is that she was under full headway up the river when the collision with her tow occurred.

The testimony for the appellees is that their tug and tow were crowded onto the American bank by the raft, which they met just before the collision.   The raft's tug was well over to the Canada side.   She signaled by two whistles to appellees' tug to take the American side.   The tail of the raft, impelled by the current, swung over so near to the American side as to force the American Eagle first, and then her tow, so close to the shore that they went aground.   Witnesses for appellants, who were aboard the Hebard and her tow, testified that they heard the exhaust of the American Eagle as the Hebard approached, and that fact is referred to as an evidence that she was in motion, and not aground, when the Hebard passed her; but the testimony for the appellees is that when the tug went aground she listed over so far that the lower end of one of the syphon pipes was above the water in the bottom of the vessel, and therefore this syphon was discharging a clear steam with a pulsing exhaust, which might be mistaken for the regular exhaust of steam when the tug was working.   Another conclusion is inevitable, and it is conceded, that if they were aground, they were in the best position possible—having been signaled by the Hebard to take the American side—to avoid her and her tow, and that no fault can be imputed to them.

According to the testimony for appellants, when the captain

of the Hebard first discovered the raft, the tail of it was 500 feet distant, and its starboard or right-hand corner about midway of the stream. The channel was some 700 feet wide and the raft 250 feet wide. The Hebard, which had already checked her speed on being notified to look out for the raft, immediately checked speed for the second time. The tug and the fore part of the raft were close to the Canadian shore. The captain testifies that he could see clear water between the tail of the raft and the Canadian shore, but it extended down the river not much over the length of his boat, possibly 300 feet. He says there was no chance to pass on that side without getting his boats aground or running into the raft, which the current was pulling out a little from the Canadian shore. He decided to pass down on the American side, and ordered the man at the wheel to port a little, and, changing the course of the Hebard starboard about three-quarters of a point, passed the raft as close as he could without touching it. As he passed the raft he was hailed from the Wilson, the first vessel of his tow, to go slow, that his line was getting foul of the raft. At that he checked the Hebard the third time. In about a minute or a minute and a half he got word that the line was clear, and gave the signal to go ahead stronger, and, the wheel having been put to starboard, he passed on down alongside the raft, the Wilson coming around the raft all right. When he ported a little to pass the corner of the raft, he gives it as his impression that the American Eagle was not up to the tug that had the raft in tow; that is, was 2,000 feet or more below. When the Hebard passed her they were 100 feet, or at least 75 feet, apart, and there was about the same distance between the Hebard and the Westside, the first vessel of the American Eagle's tow, as the Hebard passed her. The captain also testifies that the headway of the Hebard was not much affected or lessened by the last order to check speed, because it was soon followed by four bells, which was the order to go ahead stronger. Now, if this were a true statement of the facts, the collision could not have occurred. We have seen that the American Eagle and her tow were then aground, within 50 feet of the American shore. We are satisfied that the immediate cause of the collision was the Hebard's loss of control over the vessels of her tow, by checking her speed, so as to slacken the lines, and allow the vessels to lose steerageway and sheer over, by force of the current, against the up-bound tow. The repeated checking of the speed of the Hebard was the cause of the slacking and fouling of the line to the Wilson in the raft, and only by that slacking can the collision of her tow with the tow of the American Eagle be explained, when she herself passed the American Eagle at a distance of from 75 to 100 feet.

According to the testimony of the two experts,—one examined in chief by counsel for appellants, the other by counsel for appellees, and both entirely disinterested,—the safe and prudent course for the Hebard would have been to take the Canadian side of the raft in passing down. Capt. Hackett, the expert called to the stand by the appellants, in answer to a question locating the raft as passing the bend, the tug following around close to the Canadian

shore, so that the raft was wrapping around the bend, the starboard corner of the tail of the raft being mid-channel, or a little nearer the American shore, testified that it would have been safe and prudent for the Hebard to pass between the raft and the Canadian shore. It adds to the significance of this testimony that the captain of the Hebard testifies that as soon as he saw the raft he blew danger signals, a half minute before he exchanged signals with the American Eagle, but he testifies that he blew the danger signals twice, not only for his own vessels, but also for the American Eagle, and for all in the vicinity, to let them know, coming up, that there was danger there, and to look out. He also testifies that before he saw the American Eagle, when she was "quite a ways" below the tug towing the raft, he had made out a large steamer coming up astern of the American Eagle. The second mate of the Hebard testifies that he saw the raft when they were 600 feet distant from it, and at the same time saw the American Eagle coming up, and told the captain. The captain, therefore, knew that vessels were coming up on the American side, and that there was danger, and chose to take his steamer right into the midst of it, when he might have taken the safe and prudent course, both for himself and for the vessels coming up, of attempting to pass between the raft and the Canadian shore. Capt. Edwards, the other expert, examined by counsel for appellees, testified that if the upper end of the raft was in the middle of the river, or if he saw that he had room enough at the upper end to pass, he would be pretty sure of getting by the lower end. He proceeds to give his reasons for taking his chances on the Canadian side, referring to a dock and a shallow place on the American side, and to the tug coming up; also testifying that if the upper end of the raft was far enough out it would naturally swing the other way, and stop the swinging of the raft to the Canadian shore. He further testifies that he would signal to the tug of the raft to make way for him, as he would have the right to do.

These considerations and this testimony make it clear to us that, even considering the situation as claimed by appellants, the Hebard was at fault in taking the American side of the raft, and in checking speed, so as to lose control of her tow.

The record contains over 400 printed pages of conflicting testimony, which it is impossible to reconcile. There are interested witnesses and incongruities of statement on both sides. The case turns entirely upon questions of fact. Most of the evidence was taken in open court, in the presence and hearing of the trial judge. It was carefully considered and carefully decided. Under such circumstances, the conclusions of the judge who saw and heard the witnesses, and knew best what credit to give to their testimony, ought to have great weight with an appellate court, hearing the cause upon the record only, and without any additional evidence. The judgment below ought not to be disturbed, excepting upon a clear showing that it was wrong. So far from that is this case, that we find that the judgment was clearly right, and, concurring in the conclusions reached by Judge Hammond, we order that it be affirmed, with costs.