CITY OF CLEVELAND v. CHISHOLM et al.

(Circuit Court of Appeals, Sixth Circuit.   November 14, 1898.)

No. 560.

1. APPEALS IN ADMIRALTY—REVIEW BY CIRCUIT COURT OF APPEALS.
    On an appeal in admiralty from the district court to the circuit court
    of appeals, the case is reviewable both upon the law and the facts.
2. SAME—REVIEW OF QUESTIONS OF FACT—WEIGHT GIVEN TO DECISION BELOW.
    Though questions of fact are reviewable by the circuit court of appeals
    on appeals in admiralty, where the cause was tried before the judge,
    who saw and heard the witnesses, and the record contains the testimony
    of a large number of witnesses in direct conflict, a judgment based upon
    questions of fact will not be reversed, unless against the decided pre-
    ponderance of the evidence.

Appeal from the District Court of the United States for the North-
ern District of Ohio.

This is an appeal from a judgment of the district court against
the city of Cleveland for damages sustained by the steamer William
Chisholm through a collision between the steamer and a drawbridge
constructed and managed by the city of Cleveland.   The opinion of
SAGE, District Judge, clearly states the case and his conclusions of
fact and law, and is as follows:

"The claim of the libel is for damages resulting from the collision of the
steamer William Chisholm with the upper Seneca street drawbridge across
the Cuyahoga river at Cleveland.   The averments of the libel are that the
steamer started from the Upper Furnace Dock, above the bridge, about
8:45 p. m., being in every respect staunch and strong, well manned, and
equipped with the usual and necessary complement of officers and men,
and that she was in tow of a harbor tug.   As she approached the bridge
she made a proper entrance into the starboard draw, which was the cus-
tomary and usual draw for such vessels proceeding down the river.   A craft
was moored on the starboard or northerly side of the river, just below the
bridge; and in consequence it was necessary for the steamer to, and she did,
take a course close to the center protection, which extends above and below
the center pier on which the bridge swings, and should extend out from the
sides of the pier, and be of sufficient strength to ward off a vessel without
coming in contact with the bridge when properly swung.   When the steamer
was about halfway through the bridge and was proceeding slowly and in the
usual and proper course and manner, it was noticed by those in charge that
the lower end of the bridge had been permitted by those operating it to
swing out, and a little beyond the protection of the navigable part of the
draw.   The attention of those operating the draw was called to this circum-
stance, but they failed to correct the position of the draw; and, although
the steamer was promptly backed, her forward fender on the port side
rubbed against the bridge between the center pier and the lower end, and
pushed that end of the bridge away.   Thereupon those operating the bridge
permitted it to swing around so that the upper end was out and over the
side of the Chisholm, coming into collision with her cabin just abaft the
boiler house; and although she was backing strong, and was brought to a
standstill as quickly as possible, the bridge tore out the cabin, carried away
the cranes and boat davits, and the roof of the cabin, and otherwise broke and
injured the vessel to such an extent that the cost of making the necessary
and proper repairs amounted to the sum of $3,368.05, and the vessel was
necessarily detained by reason thereof for a period of eight days, during
which time her charter value, and the loss to libelants by being deprived of
her use, was the further sum of $511.08, making the total damage of $3,-
879.05.   Libelants aver that the Chisholm and her officers and crew were
without fault, and, on information and belief, that the collision and damage

were caused solely by the negligence and carelessness of the defendant, and of its officers, agents, and servants who were in charge of the bridge and operating the same. The specific faults charged are: First, the insufficient width of the protection; second, not having and keeping the bridge open in a proper manner for the Chisholm to pass; third, permitting the lower end of the bridge to swing and extend out over the channel; fourth, failing to prevent the upper end from swinging out so as to come into collision with the Chisholm's cabin; and, fifth, that the attendants in charge of the bridge were inattentive and incompetent. The answer to the libel denies each and every averment of fault, and charges that the injuries resulted from the carelessness and negligence of the officers and crew of the Chisholm, and that the collision occurred solely through the fault of the Chisholm and her crew, and without any fault on the part of the respondent.

"It is admitted that the Cuyahoga is a navigable river. The Chisholm is 264 feet in length. Her width of beam is 36 feet 9 inches. She was light, drawing 1½ feet aft and 5½ feet to 6 feet forward. She had been through the draw as often as once a week for several months or years prior to the collision, without damage to herself or to the bridge or protection. The distance from the outside of the central abutment of the bridge to the shore abutment on the starboard or northern side of the river is about 68 or 70 feet in the clear, and the width of the bridge is about 28 feet. The protection is composed of piles driven into the bed of the river, and extends 8 or 9 feet above the water, which was there about 15 feet deep, and deeper in the middle of the channel. The testimony for the city is that when the draw was open the side of the bridge and the side of the protection were exactly even, to use the phrase of one witness; that the bridge both above and below the center was flush with the protection, to use the phrase of another witness; and, according to the superintendent, that the protection throughout its length extended six inches further out than the bridge, so that, when the bridge was swung in line with the protection, its starboard side was six inches within the line of the protection. The superintendent, however, was recalled after having had the bridge opened, and seen how it stood with reference to the protection, and then admitted that, with the extreme upper end or corner of the bridge flush with the side of the protection, the lower end swung out over the channel and beyond the protection, and that, as a matter of fact, if the protection was put there for the purpose of warding off vessels and preventing contact with the bridge, it was not of a character suitable and efficient to accomplish that purpose; also, that if a man, in lining the bridge in the nighttime, with no guide excepting his eye, should get its upper end even two or three feet inside the protection, and hold the bridge there, a vessel coming down close to the protection would naturally strike the lower part of the bridge. Two other witnesses for the city (one an ex harbor master) testified that they did not consider that the protection was a safe protection for the bridge; that, to make it safe, it would be necessary to drive a row of piles outside the present piles; and that it was not as well protected as other bridges in the river. Two other witnesses for the city testified that the protection extended 12 inches further out than the bridge, throughout its entire length. The present bridge captain testified that, if one end is just inside the protection, the other end is somewhat outside, and that, because of this peculiarity in the bridge and its protection, and because it is customary for the large vessels to go within 4 or 5 feet of the protection, and often close up to it, it is necessary, and it is the practice of the bridge tenders, when a vessel is descending in the nighttime, as the Chisholm was, to hold the upper end of the bridge in until the bow of the vessel is safely entered, past the end of the bridge, and then straighten up the bridge so that the lower end may be flush with the lower part of the protection. The testimony of this witness is corroborated by that of four witnesses examined on behalf of the libelants, and is accepted by the court as the true statement of facts.

"The Chisholm came into the draw in a line substantially parallel with the line of the protection, and near the protection. At the time of the collision the stern of the vessel was but a foot or two from the upper part of the protection. The claim on behalf of the city, that she came down about the

middle of the channel, and sheered over so as to strike the protection at an angle near its lower end, and thereby threw the lower end of the bridge in and over the pier, and the upper end out, although testified to by two or more witnesses, is against the weight of the evidence. If such had been the position of the Chisholm when the protection and the bridge were struck, her stern must have been out to the center of the channel, at least, and the upper end of the bridge could not possibly have been thrown out so far as to have produced the collision. Several witnesses for the city testified that the Chisholm sheered. The testimony to the contrary is so strong as to make the fact exceedingly doubtful. But, if she did, there are strong grounds for the inference that it resulted from the displacement of water, and from the circumstance that the abutment on the shore of the northern side of the river forced the water against that side of the vessel, while on the other or port side there was much greater width, and opportunity for the water to flow away from the vessel. The weight of testimony is that the vessel did not sheer. The protection was inadequate. It was impossible to have the side of the bridge even flush with the protection for more than about half its length. If the side of the upper end of the bridge was exactly over the outer side of the protection, the side of the bridge, from a little below its center, projected over the channel; and, if the upper end of the bridge was 2 feet inside the protection, the lower end was several feet outside of it. The fact that a vessel was moored to the wharf on the northern side of the river, just below the draw, made it necessary that the Chisholm should come into the draw near the protection, because just below the bridge the river made a turn to the left, and, if the Chisholm had passed down along the middle of the channel, in swinging, her stern would have come into collision with that vessel. There is testimony tending to prove that the protection was marked with black paint, and the plank was cracked at the place where it is claimed the Chisholm sheered in and brought her bow in collision with the protection and with the lower end of the bridge; but that collision must have been by a vessel with dark paint, whereas the Chisholm was painted a light color, and had no dark paint.

"The decision of Judge Brown in Edgerton v. Mayor, etc., 27 Fed. 230, is in point. That was a case of a collision with a bridge. The court held that the duty to take proper care of a bridge included the duty to make proper provision for the passage of vessels through the draw, and that the custodians of the bridge were bound to the use of ordinary diligence to avoid accidents to vessels going through in customary manner. The city was therefore responsible for the want of ordinary care on the part of its servants. In that case there were no guards beneath the draw to protect vessels approaching it. The court said that reasonable consideration for the safety of vessels going through such passages as there existed demanded that such guards should be constructed corresponding with the open projection, and that the duty to take proper care of a bridge included the duty to make proper provision for the passage of vessels through the draw. In that case there was a strong tide. In this case it is claimed by the city that there is a strong tendency to sheer, caused probably, as we have seen, by the displacement of water in the narrow channel. Upon the whole case, I am satisfied that there was no fault in the management or navigation of the Chisholm, that the protection was inadequate, and that the draw was not operated with proper care. The decree will be for the libelants, with a reference to ascertain the amount of the damage."

Miner G. Norton, for appellant.

Harvey D. Goulder, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The errors assigned with that particularity and distinctness required by the eleventh rule of this court (21 C. C. A. cxii., 78 Fed.

90 F.--28

cxii.) challenge only the findings of fact by the district court. Full argument has been heard, and the entire evidence fully considered. The evidence was conflicting. The conclusions to be drawn therefrom depend largely upon the intelligence and frankness of the witnesses. The district judge saw and heard the witnesses testify, and was aided in arriving at his conclusions by his observations of the witnesses. This advantage we are deprived of. The act of February 16, 1875 (18 Stat. 315), was an act intended to relieve the supreme court of the labor of looking into the facts found by the circuit court in admiralty cases. That act has no application to this court, inasmuch as the act of March 3, 1891, creating courts of appeals, provides for a direct appeal from the district court to this court. There can be, therefore, no such special findings of law and fact by the circuit court as contemplated by the act of 1875. The trial here is therefore upon the law and the facts. The Havilah, 1 U. S. App. 1, 1 C. C. A. 77, 48 Fed. 684; The Philadelphian, 21 U. S. App. 90, 9 C. C. A. 54, 60 Fed. 423; The E. A. Packer, 14 U. S. App. 684, 7 C. C. A. 216, 58 Fed. 251. Notwithstanding this right of retrial here, the rule prevails that the judgment of the district court will not be reversed when the result depends alone upon questions of fact depending upon conflicting evidence, unless there is a decided preponderance against the judgment, where the trial judge saw and heard the witnesses, and had an opportunity of weighing their intelligence and candor. This was the rule applied in the circuit courts when the appeal was from the district to the circuit court. The Rockaway, 25 Fed. 775; Levy v. The Thomas Melville, 37 Fed. 271; The Sampson, 4 Blatchf. 28, Fed. Cas. No. 12,279; The Sunswick, 5 Blatchf. 280, Fed. Cas. No. 13,625; The Albany, 48 Fed. 565; The Parthian, Id. 564. It is the rule prevailing in the Second circuit court of appeals (The Jersey City, 1 U. S. App. 244, 2 C. C. A. 365, 51 Fed. 527; The Royal and Superior, 14 U. S. App. 30, 4 C. C. A. 285, 54 Fed. 204; Aktieselskabet Banan v. Hoadley, 20 U. S. App. 344, 9 C. C. A. 61, 60 Fed. 447), and in the Ninth circuit (The Warrior, 7 U. S. App. 560, 4 C. C. A. 498, 54 Fed. 534). The same rule was applied by this court in the case of The Charles Hebard, 6 U. S. App. 641–649, 5 C. C. A. 516, 521, 56 Fed. 315, 320, where District Judge Sage, speaking for the court, said:

"The record contains over four hundred printed pages of conflicting testimony, which it is impossible to reconcile. There are interested witnesses and incongruities of statement on both sides. The case turns entirely upon questions of fact. Most of the evidence was taken in open court, in the presence and hearing of the trial judge. It was carefully considered and carefully decided. Under such circumstances, the conclusions of the judge, who saw and heard the witnesses, and knew best what credit to give to their testimony, ought to have great weight with an appellate court, hearing the cause upon the record only, and without any additional evidence. The judgment below ought not to be disturbed, except upon a clear showing that it was wrong."

A like weight is attached to a finding of fact by a commissioner to whom a reference has been made in an admiralty cause, and it is difficult to see why at least equal weight shall not be given to a conclusion of fact drawn under like circumstances by the skilled and

trained intellect of the judge of the court. The Cayuga, 16 U. S. App. 577, 8 C. C. A. 188, 59 Fed. 483.

The record in this cause is a voluminous one. It presents a very wide conflict of evidence upon every material point in the case. To state its substance, or the reasons for any deduction we might draw, would be of no advantage. We are content to say that we find no reason for disturbing the conclusion reached by the very able and experienced trial judge who heard the witnesses in this cause testify, and was enabled to judge of their comparative knowledge, intelligence, and integrity. The fact that after such a hearing he found as he did is a fact of determining character on a record such as this. The judgment is therefore affirmed.