ERIE & M. RY. & NAV. CO. v. DUNSEITH et al.

(Circuit Court of Appeals, Sixth Circuit. February 16, 1917.)

No. 2849.

1. ADMIRALTY ⟨key⟩118—APPEAL—REVIEW OF FINDINGS OF FACT.
   A finding of fact by the District Judge in an admiralty suit, based upon testimony taken in open court, should be accepted by the appellate court, unless the evidence clearly preponderates against it.
   [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794.]

2. TOWAGE ⟨key⟩11(5)—LIABILITY FOR LOSS OF TOW—NEGLIGENT NAVIGATION.
   A finding by the trial court that a steamer having a barge in tow was in fault for the stranding of herself and barge on the south shore of Lake Superior in a fog, for failure under the circumstances to take soundings, which would have shown that she was several miles nearer the shore than her master supposed, held sustained by the evidence.
   [Ed. Note.—For other cases, see Towage, Cent. Dig. § 17.]

3. TOWAGE ⟨key⟩11(5)—LIABILITY FOR LOSS OF TOW—PROXIMATE CAUSE OF LOSS—STRANDING.
   The loss of the cargo of a barge while aground in Lake Superior, where she had been stranded through the negligent navigation of the towing steamer in a fog, caused by her breaking up in a storm which arose within an hour after she went aground, held the proximate result of the stranding, in view of the fact that storms on that lake so often follow foggy weather.
   [Ed. Note.—For other cases, see Towage, Cent. Dig. § 17.]

4. TOWAGE ⟨key⟩12(1)—STRANDING OF TOW—CONTRIBUTORY FAULT OF TOW.
   A barge in tow of a steamer held not chargeable with contributory fault for her stranding in a fog, because she starboarded after the

steamer struck, instead of porting, as signaled her by the steamer; the action having been taken in extremis.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 24–26.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in admiralty by John Dunseith and others against the Erie & Michigan Railway & Navigation Company. Decree for libelants, and respondent appeals. Affirmed.

F. S. Masten, of Cleveland, Ohio, for appellant.

G. B. Perry, of Detroit, Mich., for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and HOLLISTER, District Judge.

KNAPPEN, Circuit Judge. The steamer M. T. Greene, owned by appellant, while towing the barge Allegheny, owned by the individual appellees, went upon a sand bar on the south shore of Lake Superior. The barge also grounded and was wrecked, the cargo becoming a total loss. The appeal is from a final decree adjudging the steamer solely at fault, for loss of both barge and cargo. The appellee insurance company is the insurer of the barge's cargo.

We accept the findings of the District Judge as to the course and general features of the steamer's navigation, based upon the testimony of her navigators. The substance of those conclusions is this: The steamer, which was loaded with lumber, left Duluth on June 4, 1913, with the barge in tow, likewise so loaded, and took the inside course between Keeweenaw Point and Gull Rock at about 4:30 o'clock on the afternoon of the next day, then taking a course southeast by east. At about 9:30 p. m., just after passing Stannard Rock (which lies to the eastward of the taken course), the weather became thick and foggy; there was, however, no wind to speak of. When the fog was encountered, speed was checked from 7 miles to about 6 miles per hour, and the same course followed until about 11:50 p. m., when it was changed to east by north by one-half north. This latter course was followed until 6:10 a. m. of the 6th, when the course was changed to east, being continued until 8:45 a. m., when it was changed to southeast by east by three-fourths east. The weather continued thick and foggy. At about 9:30 a. m. the steamer picked up the Caribou whistle from the northerly. At 12:15 p. m. she ported a point for the purpose of running more to the southward to pick up the Crisp Point signal; Crisp Point being about 14 miles westerly of Whitefish Point, which is at the entrance of Whitefish Bay, the latter communicating with the head of St. Mary's river. After sailing the last-stated course about 50 minutes, and thus at about 1:05 p. m., the Crisp Point signal was picked up. The steamer then starboarded a point, intending thereby to come back on the supposed Whitefish Point course, viz., southeast by east by three-fourths east, continuing on the latter course 1 hour and 25 minutes, and until about 2:30 p. m., when in the fog, which still continued, she went on a sand bar about 5 miles east of Crisp Point and 9 miles west of Whitefish Point. The barge also immediately ran on the bar,

and despite the efforts of the steamer and of the life-saving crews could not be released. Up to this time the wind had been light; but soon after the barge went aground a strong wind came up, followed by a heavy sea, which continued during the night and part of the following day, resulting in the wrecking of the barge and the loss of her cargo.

There is no room for doubt that the steamer's running aground resulted directly from her navigator's mistaken belief that when she picked up the Crisp Point signal she was about 9 miles to the northerly of that point, whereas in fact she was but about 2 miles away. This mistake as to location doubtless resulted from inexact knowledge of the actual speed at all times, as applied to the courses run. Had the steamer then been where her navigators thought she was, the change of course then made would have carried her safely past Whitefish Point. In her actual location, the course taken was bound to fetch her up on the south shore before reaching that point. The suggestion that the mistake as to location was due to a deflection of the compass needle, caused by shore attraction, has no substantial basis in the record.

Numerous faults are charged against the steamer including the criticisms that she was not properly officered and manned; that she was negligent in proceeding at so nearly full speed in a fog; that she had no log, and thus no means of knowing accurately how far she was running on a given course; also that she was negligent, under the circumstances presented, in not taking soundings to ascertain her exact location.

[1] 1. The Steamer's Fault. With respect to each of the faults alleged against the steamer, except the failure to take soundings, the District Judge either found in favor of the steamer or thought it unnecessary to decide the question. After an elaborate consideration of the testimony, all of which was taken in open court and under active participation therein on the part of the District Judge, the latter reached the conclusion that, although the steamer was not negligent in not knowing where she was before hearing the Crisp Point signal, nor in misjudging the distance of the sound of the whistle, yet that under the existing circumstances due care and prudence required that her navigators take careful soundings, and that soundings would have clearly disclosed the fact that the steamer was not where her navigators thought she was, and would have indicated that she was close to the south shore. This conclusion of the District Judge, that the steamer was so in fault, reached after a hearing of the character stated, should be accepted by us, unless the evidence clearly preponderates against it. City of Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157; Monongahela, etc., Co. v. Hurst (C. C. A. 6) 200 Fed. 711, 119 C. C. A. 127; Pugh v. Snodgrass (C. C. A. 6) 209 Fed. 325, 126 C. C. A. 251. The evidence does not so preponderate; but, on the contrary, after a careful consideration of the testimony, we are affirmatively impressed that the conclusion reached by the trial judge was correct.

[2] The prominent considerations which moved the court to this conclusion are these: The recognized uncertainty of sound in a fog as

a guide in determining, not only distance, but direction; that after picking up the Crisp Point signal the steamer's navigators continued to hear it; that they ran 1 hour and 25 minutes after hearing the Crisp Point whistle, listening all the while for the Whitefish Point signal, but unable to pick it up; that for about 2½ hours they had not heard the sound of any other boat, although they had met a number before; 'that under these circumstances due prudence would have put the steamer's navigators on their guard, and caused them to so far suspect that the actual location was not what they supposed it to be as to require them, in the fog, to take soundings. At 6 miles an hour, the steamer must have run in 1 hour and 25 minutes at least 7 miles on the last course. Assuming that the signal was picked up at the close of the 50-minute course, had the steamer been where her master supposed she was, she would have been within 7 miles or so from Whitefish Point at the time she grounded. Captain McIntosh, defendant's expert navigator, testified that if he had gone 7 miles abreast of Crisp Point and had not picked up Whitefish Point he would be uneasy and would have used his lead, and had he found but 6 or 7 fathoms of water (as would have been the case here) he would have known that he was close to the beach and would have pulled off to the northward. The chart effectually bears out the conclusion that the soundings would have shown that the steamer was off her course, for, as the District Judge found, on the regular Whitefish Point course there was no point at which the soundings would have shown as little as 6 or 7 fathoms, and while for a short space only 8 or 9 fathoms would have been shown, in the ' locality generally there was very much deeper water. The fact that the master of the barge had the same supposition as held by the steamer's officers as to the actual location when the Crisp Point signal was picked up is not highly significant on the question of the steamer's fault. The latter, not the barge, was charged with the duty of navigation; the barge was under the steamer's control, and was at the rear of the steamer by the length of a long towline, and had nothing to do with her navigation. Without more elaborate discussion of details, and without passing upon the other questions of fault alleged, we have no difficulty in affirming the conclusion of the District Judge that the steamer was negligent at least with respect to the fault just discussed.

[3] 2. Appellant contends that the damage to the barge and cargo was not the direct and proximate result of the stranding, but was due to a subsequent independent and self-operating cause, viz., the intervention of the storm and heavy sea. We cannot agree with this contention. We think that, under the circumstances presented here, the loss of the barge and cargo must be held to have been the natural and proximate result of the stranding. As pertinently said by the District Judge:

"Storms are so common on Lake Superior and so often follow foggy weather, stranding so often results in the destruction of vessels by storm, that it seems to me that we must say that to strand may, and is likely to, subject to destruction by the waves."

The case differs radically from Northwest Transportation Co. v. Boston Marine Ins. Co. (C. C.) 41 Fed. 793, cited by appellant,

239 F.—52

where in a suit upon a policy of marine insurance the voluntary scuttling of the stranded ship by her master, to avoid the consequences of a heavy storm which arose several hours after the stranding, was held, under a construction of the contract of insurance, not to be the proximate result of such stranding. The only damage was that directly resulting from the scuttling. As recognized in the case referred to, the particular facts and circumstances in each case largely control and determine the application of the rule of proximate cause. Here, while there was but a slight wind at the time the barge went aground, the wind and sea not unnaturally to be anticipated came up very soon (perhaps half an hour) after the stranding, and directly caused the breaking up of the barge and the loss of the cargo. We agree with the District Judge that the barge is not shown to have been unseaworthy, having in view the season and the character of her cargo.

[4] 3. Appellant suggests that the barge was also at fault for running aground, in that the steamer, at the time she went on the bar, signaled the barge to starboard; and that, had the signal been obeyed, the barge would have gone into good water, but that she ported, and so ran directly on the bar. Assuming for the purposes of this opinion, that the signal to starboard was both given and received seasonably (although that is not entirely clear), we think the District Judge rightly held that in the crisis presented, including the fog and danger of collision with the steamer, the barge cannot be held legally at fault for the maneuver. Had she made no use whatever of her helm, she would have gone upon the bar; the only difference seems to be that, as the helm was used, she went on practically at right angles; and it is not clear that as she was headed, and in her nearness to the bar, starboarding would have prevented grounding.

The decree of the District Court is affirmed.

⬦⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes