## THE PERSEUS.

### UNITED FUEL & SUPPLY CO. v. INTERLAKE S. S. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 4, 1921.)

No. 3469.

1. **Admiralty ⊜118—Findings by trial judge final.**

   Conclusions of fact by a judge in admiralty, who personally saw and heard the witnesses, and thus had an opportunity of weighing their intelligence and candor, must be accepted, unless the evidence decidedly preponderates against them.

2. **Collision ⊜95(2)—Steamer held not at fault for collision with tow on steamer's side of channel.**

   On a libel for a collision between a steamer and a tug and tow, which occurred on the steamer's side of the channel, where it was undisputed that the tug, after sounding a signal for a port to port passing, sounded an alarm signal and a two-blast or starboard to starboard passing signal, and turned sharply to port across the steamer's path, evidence *held* not to sustain the tug's contention that the steamer had failed to respond to the first passing signal, or had turned across the tug's course, so that the collision was solely the fault of the tug.

3. **Collision ⊜95(2)—Unincumbered vessel not liable for collision of tow, not resulting from difficulty in handling tow.**

   The fact that one of the two vessels in the collision was unincumbered, while the other was incumbered with a tow, does not establish the fault of the unincumbered vessel for failure to keep out of the way of the incumbered vessel, where the collision occurred, not because of any difficulty in maneuvering the tow, but solely because of improper navigation of the tug.

Appeal from the District Court of the United States for the Northern District of Ohio; D. C. Westenhaver, Judge.

Libel by the United Fuel & Supply Company against the Steamer Perseus; the Interlake Steamship Company, claimant. From a decree dismissing the libel, libelant appeals. Affirmed.

Sherwin A. Hill, of Detroit, Mich. (Warren, Cady, Ladd & Hill and Carl V. Essery, all of Detroit, Mich., on the brief), for appellant.

G. W. Cottrell, of Chicago, Ill. (Hermon A. Kelley, of Cleveland, Ohio, on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

KNAPPEN, Circuit Judge. Appeal from a decree in admiralty dismissing libel for damage by collision. Shortly before midnight of July 29, 1917 (central standard time), the tug Annie L. Smith, having in tow the scow Chinook, collided with the steamer Perseus in the St. Clair Flats. Both tug and scow were sunk. Their owner filed this libel. The District Court, on final hearing found the Perseus free from fault and dismissed the libel. The Perseus was a steel freighter, 480 feet keel, was down-bound, loaded with iron ore, drawing about 20 feet, and was making about 9 miles an hour. The tug was upbound, was 65 feet in length, and making 4½ miles an hour. The scow was 130 feet long and was without cargo, being towed by a 25-foot line.

The Perseus came down the west, or down-bound, channel of the St. Clair Flats Canal, and somewhere between the lower end of the canal proper and the lower entrance of the canal, which is about 1⅛ miles lower down, was sighted by the tug Smith (which was then at least three-fourths of a mile below the Perseus); the tug thereupon giving a one-blast, or port to port, passing signal. Soon afterward, when the Perseus was still several hundred (apparently 500 to 1,000) feet above the tug, the latter blew an alarm, followed by a two-blast, or starboard to starboard, passing signal, hard-starboarded her helm, and made a sharp sheer to port and directly across the bows of the down-coming steamer, which struck the scow nearly at right angles on the starboard side, about 50 feet back from its forward end, later colliding with the tug. The collision occurred, according to the weight of the testimony, about half a mile below the lower entrance of the canal. To this extent the facts are either conceded or not seriously disputed.

The real question relates to the cause and asserted justification for this action of the tug, whose navigator asserts that soon after he had blown the one-blast passing signal (at which time the Perseus was admittedly coming down the channel on the regular course, and showing both red and green lights), the Perseus, which, the tug asserts, had made no reply to the latter's passing signal, hauled off to its port (easterly) across the channel, entirely shutting out its red light, and having, when the tug blew her alarm and gave the two-blast passing signal, reached a point where the Perseus was on the tug's starboard, thus putting the tug in extremis. The Perseus, on the contrary, asserts that she promptly accepted the tug's one-blast passing signal (by blowing the regular one blast), and kept down the regular course on the westerly side of the channel and headed slightly to starboard; that

when the tug blew the alarm and the two-blast passing signal the latter was well off the Perseus' port bow; and that on hearing the tug's signal the Perseus immediately replied with an alarm and one blast, ported her wheel and reversed, doing everything possible to avoid collision, which occurred in the westerly half of the channel. The merits of the case depend upon the credibility of these respective and conflicting claims.

The testimony was all taken in open court. It appeared that the navigation of the tug at and prior to the collision was entirely in the hands of the mate; the master having turned in and no other person being on deck, except the lookout, who could not be located and was not produced as a witness. As the trial court said:

"For all practical purposes there was no lookout kept, and the tug was handled and navigated by the mate without other assistance. He was in charge of all the duties of master, wheelsman, navigator, and watch."

On the part of libelant, the mate was the only witness having knowledge of the navigation of either the tug or the steamer. The scow, also, was navigated entirely by the tug; her rudder being lashed down, and none of her crew being on deck, except a watchman. On the other hand, the master, wheelsman, and second mate of the Perseus, all of whom were on duty, appeared and testified, the lookout only being absent; counsel's statement being accepted as evidence that reasonable diligence had been exercised to ascertain his present whereabouts and to procure his attendance. All of the witnesses for the Perseus impressed the trial judge as "intelligent and frank as witnesses and highly competent as seamen." The testimony of the tug's mate was, in the court's opinion, "so far discredited that wherever a conflict exists his testimony must be disregarded. His appearance and bearing on the witness stand do not impress one favorably." The facts were found to sustain the claims of the Perseus as to her own navigation and freedom from fault.

The claim of the tug's mate that the Perseus had directed her course to port across the channel was expressly rejected, and the finding made that the Perseus "was in her proper course at the time the alarm was given and west of the center of the channel." This finding was based not alone upon the testimony of the master and other officers of the Perseus, but was corroborated by the testimony of the master of the Griffin, which was following the Perseus, and, as asserted, not more than half a mile behind her, watching her course, in connection with getting the range for steering his own vessel, and who testified that the course of the Perseus and her position at the time of the alarm was that claimed by the crew of the Perseus. Corroboration was also found in the testimony of the master of the Robinson, who met and passed the Perseus at about the time the tug gave the Perseus the port to port passing signal, afterward heard the alarm signals, and on looking back says he saw the Perseus, and that she was well to the westward of the center of the channel.

The judge expressed the opinion that the tug's maneuver which brought the boats into collision could be accounted for only "on the assumption that the mate of the Smith, burdened with the duties of mas-

ter, watch, and wheelsman, was not observing either the position of his own vessel or of the Perseus, and on a sudden and hasty observation wholly misread the signals and misconstrued the situation," and that the asserted failure of the tug's mate to hear the acceptance by the Perseus of the tug's one-blast passing signal "is explainable only on the assumption that he is either not telling the truth, or was then paying no attention to what was happening." The conclusion was reached that—

"In view of the maneuver made by the Smith a collision was then unavoidable, and no blame is to attach to the Perseus because of anything she did or failed to do after the Smith sounded her alarm."

The tug was found at fault, sufficient to account for the collision, in failing to hear the one-blast response of the Perseus; not hearing it, in continuing to navigate thereafter on the assumption that a port to port passing agreement had been made; also in giving a cross-signal when the boats were but a few hundred feet apart, and executing it without waiting for response from the Perseus.

[1, 2] The conclusion of law that the Perseus was without fault is plainly justified, if the court's conclusions on the facts are to be accepted; and the rule is thoroughly settled that such conclusions of facts by a judge who personally saw and heard the witnesses, and thus had an opportunity of weighing their intelligence and candor, must be accepted, unless the evidence decidedly preponderates against them. City of Cleveland v. Chisholm (C. C. A. 6) 90 Fed. 431, 434, 33 C. C. A. 157; Monongahela Co. v. Schinnerer (C. C. A. 6) 196 Fed. 375, 379, 117 C. C. A. 193. In our opinion, the evidence does not so preponderate. To start with, we think it clearly preponderates in favor of the fundamental conclusions that the Perseus promptly accepted the tug's port to port passing signal, and that the tug should have heard and recognized it, that the collision occurred in the west half of the channel, and substantially on the Perseus' regular course, and that the tug's faults were enough to account for the collision.

The burden is, of course, on the libelant to establish the faults alleged against the Perseus. Appellant insists that the Perseus must have swung to the eastward, as claimed by the tug, because the location of the collision, as given by the master of the Perseus, was 75 to 100 feet farther from the west bank of the channel than that given by him as of the time he passed the Robinson farther up, and that the master testified before the inspectors, soon after the collision, that upon receiving the tug's alarm he swung nearly two points to starboard; from this it is argued that when this swing began the Perseus must have been at least 200 feet east of the place of collision. But the available data are, to our minds, too uncertain and indefinite to support anything like accurate mathematical computations. The various statements of distance seem to have been, at the best, merely estimates in the darkness, without landmarks, and with only range lights, running lights, and distant pier lights to go by. The exact place of the collision is naturally more or less uncertain, apart from its general location in the west half of the channel, and the testimony is not convincing that a swing of nearly two points after the alarm would necessarily cause a

swinging of the bow of the Perseus within the distance involved to such an extent as substantially to affect the conclusion otherwise demanded by the evidence.

The testimony of the Perseus' master before the inspectors, that the Perseus swung 400 feet under the port helm, was, on the trial below, rejected by him as clearly wrong, and due to a misunderstanding of the question, and with the insistence that a swing to that extent was impossible. The testimony, at the most, affected the credibility of the witness; it is opposed to his testimony on the trial, as well as to that of the helmsman. The fact that the heading of the Perseus at the time of the collision as given by the master was two points to starboard of the course straight down the channel is not necessarily inconsistent with the master's estimate of his swing after the tug gave the alarm.

The argument that the master of the Perseus should have known that there was danger of collision, because the tug's green light was not shut out until shortly before she made her asserted swing to port, is at most but a circumstance bearing upon the ultimate conclusion. We are unable to say, from this record, that considering the height of the Perseus' navigator above the tug the green light would have been shut out from his view early enough to reasonably indicate to him that the tug was not carrying out the existing port to port passing agreement.

[3] The contention that the Perseus violated the duty of an unincumbered steamer to keep clear of a craft burdened with a tow is, in our opinion, properly answered by the trial court in the statement:

"The collision did not happen because the Smith was incumbered with a tow and could not be maneuvered and handled with the same freedom as a tug thus not encumbered. The weather was calm, and such wind as was blowing would aid rather than hinder the tug in keeping on her proper course."

In our opinion, the arguments presented against the correctness of the decree below, neither singly nor all together, are enough to disturb that conclusion.

The judgment of the District Court is accordingly affirmed.