**KENNEDY et al. v. ANDERSON–TULLY CO. et al.**
**MINNEAPOLIS DREDGING CO. et al. v. SAME.**
**No. 7665.**

Circuit Court of Appeals, Sixth Circuit.
March 9, 1939.

J. S. Edmondson, of Memphis, Tenn. (J. S. Edmondson, of Memphis, Tenn., Koon, Whelan, Hempstead & Davis, of Minneapolis, Minn., and Dixon, Williams & Edmondson, of Memphis, Tenn., on the brief), for appellants.

John Vorder Bruegge, of Memphis, Tenn. (John Vorder Bruegge, of Memphis, Tenn., on the brief), for appellees.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

The Wolf River flows through the northern part of Memphis and into the Mississippi at the foot of Beale Street. It has a drainage area of about seven hundred seventy-five miles extending eastwardly for a distance of more than seventy miles. C. E. Kennedy, doing buiness as C. E. Kennedy Dry Dock Company (herein called Kennedy), and engaged in the business of docking, building and repairing boats at the foot of Beale Street, had a large part of its equipment of various sorts moored to the bank of Wolf River at that point.

Appellant, Minneapolis Dredging Company (herein called Minneapolis), was engaged in widening, deepening and aligning Wolf River and had a dredge called "No. 2" moored to the west bank opposite Market Street. Anderson-Tully Company had a large saw mill on the east bank about a mile and a half above Dredge No. 2. The principal business of Patton-Tully

Transportation Company (herein called Tully) was to do the river work, such as handling logs, etc., for the Anderson-Tully Company. B. C. Tully was President of both companies.

Tully had a fleet of barges lashed as a unit and moored to the west bank opposite the Anderson-Tully plant. On Monday, January 21, 1935, about 1:15 P. M. this fleet broke from its moorings, drifted down the river and striking Dredge No. 2 tore it from its moorings and carried it down the stream and in conjunction with other floating vessels collided with the vessels and equipment of Kennedy.

These libels were for the resultant damages. Tully denied that it was guilty of negligence; and averred that its fleet became adrift because of an unprecedented rainfall that converted the usual current of the river into an uncontrollable torrent, which violently tore its fleet from its moorings and carried it down the river with irresistible force, and that the damages suffered were the result of an unavoidable accident or vis major which could not have been foreseen and guarded against.

C. E. Kennedy having died, his cause of action was revived in the name of his administrators. Alliance Insurance Company, which carried an insurance policy for the protection of Minneapolis, intervened. The causes were consolidated and, at the hearing, were dismissed.

The court made findings of fact. It found that the collisions occurred about 1:30 P. M. on January 21st; that at Moscow, about forty miles east of Memphis, the rainfall during the twenty-four hour period preceding the 21st, was 8.52 inches, which was the greatest amount of rainfall during a similar period ever known in Tennessee during the month of January; that this unexpected and abnormal rainfall produced an unprecedented flood; that the river rose many feet above the highest known water mark and that its current, due to the flood, was of unprecedented velocity and suddenness; that the swift and powerful current, in excess of fifteen miles per hour, washed out the west bank to which the Tully fleet was moored a distance of from one hundred to three hundred feet back westwardly and for more than a quarter of a mile along the stream; that two large cottonwood trees, each from two and one-half to three and one-half feet in diameter, to which the principal headlines of the fleet were fastened, were washed away and that as a result the remaining mooring cables and lines were broken and the fleet broke away; that, at that time, the weather was cold, the visibility variable, there being intervals of snow and sleet, and the wind was blowing from the north and northwest.

These findings are fully supported by evidence and there is no substantial evidence to the contrary. The court further found that Tully had used such care in mooring and securing its fleet as was dictated by the practices and operations of prudent and experienced river men on the river, under similar circumstances, and that the fleet was moored to good and satisfactory fastenings, with sound and sufficient lines.

While there is evidence tending to show that other boats moored along the river were not broken loose and that prior to its breaking away, the Tully fleet, being lashed three or four abreast, projected too far into the stream and was moored to trees grown close to the river bank in sandy soil and silt, and that the rainfall preceding the "run-out" in the river was a warning of impending danger; yet we find the decided weight of the evidence to be that, about the first of January, Tully, after consulting with experienced river men, tied its fleet to the west bank under a "point," i. e., where the natural current would not strike it, and that this was regarded as a safer place than any convenient, available point on the east bank. These boats were lashed together, three abreast, and composed a unit five or six hundred feet long, which extended out into the river a distance of about ninety-six feet. This was regarded as more practical mooring than to extend the boats in a single line along the river for a distance of about fifteen hundred feet. The fleet was secured to the bank by four heavy steel or wire cables for headlines and a number of other wire cables and an inch grass cable that were used as breast and stern lines. These were all tied to trees on the bank. Two one and a quarter inch galvanized steel cables were tied to two large, sound cottonwood trees something like three feet in diameter and standing from one hundred to one hundred and fifty feet from the shore. All these trees

stood in mainland soil called gumbo as distinguished from washed in or made soil, nearer the shore, consisting of sand or silt. The weight of the testimony is that under normal conditions the fleet was properly and carefully moored. Although it had been raining on Friday, Saturday and Sunday, there was very little current in the river Sunday evening and there appeared to be no cause for alarm. The available weather reports for Friday and Saturday did not forecast flood conditions. No report was issued by the Bureau on Sunday. Moreover the stage in the Mississippi on Sunday was around fourteen feet and it was generally understood that at that stage there was little likelihood of a run-out in the Wolf such as might occur if the stage in the Mississippi was low, i. e., from zero to ten feet. Two regular watchmen and an extra watchman were left in charge of the fleet on Sunday night. By 7:30 o'clock Monday morning the river was running out very swiftly. Estimates were given by different witnesses as to the velocity of the current. These varied from ten to twenty miles per hour up to about 9:30 A. M. and at some points even as high as twenty-five miles per hour. The water rose rapidly until, along the river bottoms, it was five to six feet over the Bristol Highway which had been located a foot and a half above any previous high water mark. Five bridges over main highways were carried out. The North Second Street bridge, north of the Tully plant, went out about 9 o'clock. At this time the waves at this bridge were about six feet high, the current was running at about thirty-five feet per second, and three hundred feet of the road leading to the bridge were washed out. The west bank of the river below the bridge caved in for a distance of about 2,700 feet to a maximum width of 300 feet. The current carried a large amount of drift, such as logs and trees and a few vessels broke from their moorings. As illustrating the force of the current, two sixteen inch H steel beams used as "spuds" in mooring the dredge "Urbana" were bent and twisted. The damage caused by the flood in the vicinity of Memphis exceeded $300,000 and that done to the highways was more than $100,-000. The Tully fleet itself, valued at $300,000, was damaged to the extent of $50,000. It had now become impossible for Tully to move the fleet because no towing vessel could stem the current. Early in the morning it put on additional lines but by twelve o'clock the adjacent bank began to give way and continued to cave in until about 1:15, when the large cottonwood trees gave way, whereupon the remaining cables snapped and the trees with their steel cables still attached went out with the fleet.

■■■■. We concur in the finding that Tully was not guilty of negligence in the manner of mooring. If the large cottonwoods had held, the fleet would have held, but it could not have been reasonably anticipated that the bank would cave in the entire distance from the shore to the trees. We recognize that the burden was upon Tully to show affirmatively that the collisions were the result of inevitable accident. The Louisiana, 3 Wall. 164, 18 L.Ed. 85; The William E. Reis, 6 Cir., 152 F. 673, 676; The Olympia, 6 Cir., 61 F. 120. The test is, whether they could have been prevented by the exercise of ordinary care, caution and maritime skill. The Morning Light, 2 Wall. 550, 17 L.Ed. 862; The Grace Girdler, 7 Wall. 196, 19 L.Ed. 113. The Jumna, 2 Cir., 149 F. 171. We think that, notwithstanding any conflicting evidence, Tully has sustained the burden which the law imposed. The question is one of fact. While the consideration of cited cases is helpful, after all, each case must stand or fall upon its own peculiar facts and circumstances. The District Judge saw and heard the witnesses and we are not authorized to reverse his judgment unless the decided preponderance of the evidence is against his conclusions of fact. City of Cleveland v. Chisholm, 6 Cir., 90 F. 431, 434; The Edward Smith, 6 Cir., 135 F. 32, 34; Monongahela River Consol. C. & C. Co. v. Schinnerer, 6 Cir., 196 F. 375, 379; The Perseus, 6 Cir., 272 F. 633, 636; Shepard et al. v. Reed, 6 Cir., 26 F.2d 19. Here there is certainly no decided weight of the evidence in favor of appellants' contention.

The judgment is affirmed.