**AMERICAN S. S. CO. v. INTERLAKE S. S. CO.**

No. 11301.

United States Court of Appeals Sixth Circuit.

Feb. 6, 1952.

Laurence E. Coffey, Buffalo, N. Y. (Richards & Coffey, Buffalo, N. Y., Leckie, McCreary, Schlitz, Hinslea & Petersilge, Cleveland, Ohio, Laurence E. Coffey, Buffalo, N. Y., Lucian Y. Ray, Cleveland, Ohio, James P. Heffernan, Buffalo, N. Y., on the brief), for appellant.

McAlister Marshall and Carl A. Schipfer, Cleveland, Ohio (Arter, Hadden, Wykoff & VanDuzer, Cleveland, Ohio, Carl A. Schipfer, McAlister Marshall, Cleveland, Ohio, on the brief), for appellee.

Before HICKS, Chief Judge, and SIMONS and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

These appeals grow out of a collision between two vessels proceeding in opposite directions at the westerly end of Lake Erie shortly after midnight on November 2, 1948 during heavy fog. The District Judge, after nine days of trial, careful analysis of the evidence and detailed findings of fact, concluded that both vessels were equally at fault and should equally share the damage. The owners of each vessel assert that the faults of the other ship were so gross that it alone should be held liable but each also contends that if its vessel was guilty of faults which contributed to the collision they were excusable under the "Major and Minor Fault Rule."

After a most painstaking study of the record, including evidence offered by officers and seamen of each ship, masters of other ships in the vicinity, of the charts and other exhibits in the case, we but find ourselves in fog nearly as thick as that on the lake during the night of collision. Our study of the record is in response to the rule long adhered to in this and other circuits that while an appeal in admiralty is a trial de novo, the findings of the District Judge will be accepted unless clearly against the preponderance of evidence. The William A. Paine, 6 Cir., 39 F.2d 586; The Perseus, 6 Cir., 272 F. 633; Drowne v. Great Lakes Transit Corporation, 2 Cir., 5 F.2d 58; Shepard v. Reed, 6 Cir., 26 F. 2d 19. And so out of many direct con-

22. Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491, 494; Mel- vin v. Reid, 112 Cal.App. 285, 297 P. 91, 93.

flicts of evidence and challenged assumptions and estimates in respect to signals, bearings, speed, and time, we have endeavored to discover evidence upon which some confidence may be placed in determining soundness or unsoundness in the District Court's decision, always keeping in mind that having heard and seen the witnesses (all but one of whom testified orally) it had advantage superior to ours for ascertaining the truth.

It would be important if we could know the approximate place of the collision and the course of each of the colliding ships. We do of course know the general locale of the accident and the destination of the vessels. The Armstrong, owned by The Interlake Steamship Company, libellant, fully loaded, was downbound and proceeding easterly to Erie, Pennsylvania; the Boland, owned by the American Steamship Company, respondent and cross-libellant, was upbound and was proceeding to Toledo from Lorain, Ohio. They met somewhere between Colchester Reef at the Westerly end of Lake Erie and Pelee Passage Light at Middle Ground Shoal east of Colchester. The distance between them is seventeen miles. The westerly course from a point a mile north and abreast of Pelee Passage Light to a point three-quarters of a mile south and abreast of Colchester Reef is course 283° and the reverse for an eastbound vessel is course 103°. The course for a westbound vessel proceeding to Toledo from a point off Pelee Passage Light is course 278°. Thus, it will be seen that the two courses for an eastbound vessel converge abreast of Pelee Light and for a westbound vessel they there separate.

After the Armstrong had passed Colchester Reef the fog became very thick as it likewise did for the Boland after passing Pelee Island Light. Ahead of the Armstrong was the eastbound steamer Elwood which shortly after the Armstrong had passed Colchester reported to it by telephone that it had just met four upbound boats, one right after the other on the one-whistle side, and that the Armstrong would be seeing them shortly. The one whistle, of course, indicates a port-to-

port passing. The four vessels mentioned by the Elwood were seen in the scope of the Armstrong's radar and appeared to be steaming one right after the other in a line parallel to the Armstrong's course in an opposite direction and on the port bow of the Armstrong. The Armstrong initiated a passing agreement with the first of the vessels which proved to be the steamer Colonel Schoonmaker. This ship was passed upon a one-blast agreement and when they approached the Armstrong hauled 5° and then came over to 115°. According to the Armstrong's course recorder there was a further alteration to 125° at 11:55 P.M. According to Captain Smith, the Armstrong blew four or five one-blast passing signals to which there was no reply and then checked its engines to half speed. It continued to blow one-blast passing signals—had no reply until just prior to the collision when the Boland was heard blowing a two-blast passing signal.

It would seem that the Armstrong having been advised by the Elwood that it had passed four steamers in line, and having seen them on its radar, and having taken the precaution to give the first of these steamers a wide berth, was exercising reasonable precaution to avoid collision, unless it knew that the Boland had altered its course from 283° to Colchester to 278° to Toledo. If he did know it, he might have apprehended that he was on a course too far to the South. This presents one of the major problems presented to the District Judge, for the Boland while not equipped with radar was equipped with a ship to shore radio telephone having an open channel which permits all ships to receive messages. The Boland contends that it made a safety call informing all vessels that it was steering a 278° course bound from Middle Ground to Toledo and that some time later she blew three two-blast signals for a starboard-to-starboard passing. The Armstrong claims she heard no safety call and only one starboard passing signal immediately before the collision. On the other hand, the Boland had overheard the Elwood's message to the Armstrong that the Elwood had met four steamers on

the port side and it had itself passed the Elwood on a port-to-port crossing with wide clearance. Unless the Elwood was far south of the 283° course, it is difficult to reconcile its port-to-port crossing with the Boland if the Boland was on the 278° course. In any event, the Boland knew that the Armstrong was following the El- wood either directly behind or upon a parallel course and each vessel distinctly heard the other's fog signals. Moreover, Captain Fitch of the Elwood testified that when his ship passed all of the four west- bound vessels on a port signal it was about 3½ to 4 miles west of Pelee Passage Light. Because of the neutral character of this evidence, the District Judge gave great weight to it and concluded that even though the Boland had been checked shortly west of Middle Ground it had run considerably beyond the turn before actually adjusting to the 278° course on the Toledo run and that this view seemed to be fortified by the unusually broad port passing of the El- wood; that if so the Boland would not be in position to claim a starboard passing and that if in such situation she failed to re- spond and accept the Armstrong's one- blast passing signal it would constitute gross negligence and fault. He conceded that this inference was somewhat at vari- ance with the evidence of the Schoon- maker's captain, who testified that from his observation of his radarscope the Boland was astern of the Schoonmaker and off its port to the south of his course and that the Armstrong appeared to be bearing to the right of 283° converging on the Bo- land's course. He dismissed this evidence, however, on the ground that the Schoon- maker's estimate was at variance with the other testimony on that subject including the Boland's evidence that the approaching Armstrong was two or three points off its starboard bow according to fog signals which were heard, and upon closer ap- proach the signals seemed to broaden and the bearing to widen. In endeavoring to reconcile the estimates of the different wit- nesses as to the distance of the point of collision from Middle Ground which were as far apart as three to five miles he con- cluded that the collision occurred at a point

somewhere from six to seven miles west of Middle Ground and substantially mid- way between the 278° and 283° courses.

For reasons presently to appear, we think we have no need to consider the accuracy of the District Court's finding as to the place of collision. It seems to be reason- ably clear that the master of each vessel knew the other was approaching in heavy fog. It seems also clear that neither ship knew the bearing of the other or its speed. When the Armstrong received no response to its one-blast passing signals, if they were blown, it was at fault in not reducing its speed to bare steerageway and to navi- gate with caution. It should have com- plied with Pilot Rule No. 15, 33 U.S.C.A. § 272, and its failure to do so proximately contributed to the collision.

The Boland hearing fog signals at a point and a half off its starboard bow like- wise was at fault in failing to reduce its speed to steerageway. It continued at half speed until immediately before the colli- sion, knowing that the Armstrong was about to pass, but in the dark as to its bearing. It seems also clear that when the master of the Boland learned that the Arm- strong had radar he ignored precautions required of him but pinned his faith to the care expected of the Armstrong. It is as though an automobile driver in the face of approaching traffic were to rely entirely upon the brakes of oncoming vehicles and the reflexes of their drivers, rather than upon his care for his own safety. It later appeared that the Armstrong's radar was not functioning dependably.

One bit of evidence, it seems to us, speaks eloquently of the Boland's fault. George Palyo, its wheelsman at the time of colli- sion, answering a query as to whether he had observed anything from the Captain of the Boland before he ordered his rudder hard left replied "well, yes, Captain Mon- roe blew and after the second set was blown Captain Monroe said, 'thank God, we are by him.'" This observation points to the apprehension of Captain Monroe that he was in a dangerous situation. How long before he had sensed the danger is impos- sible to say except that it must have been

at least several minutes before the crash, in view of his evidence that he blew three passing signals interspersed with repeated fog signals minutes apart. But, though conscious of danger, Captain Monroe failed to alter his course or check his speed until he observed the range lights of the Armstrong, and collision could not be avoided.

Another precaution the Master of the Boland failed to take was in his failure to avail himself of his searchlight. It was agreed by the witnesses on both sides that the fog was low-lying and above it the stars could be seen. The Armstrong had pointed its searchlight straight up and its glow was seen on the Boland for some time prior to the collision. The Boland searchlight was dark and was turned on too late to be of any use to the approaching vessel until immediately before the collision.

We make no effort to determine the speed of the approaching vessels based on deductions drawn from differing time clocks and post facto entries upon the log of each ship. They but invite surmise as to fault as well as to the probable point of contact. The ships did collide and each sustained damage. We agree with the District Judge that this evidence is speculative and adds little to establish the courses of the two ships or to assay their caution or lack of caution in approaching each other.

At the time of the collision both vessels were in Canadian waters. They were, however, both of American registry, owned and operated by American companies and each bound from one American port to another. A question, therefore, arose as to whether recovery should be governed by Canadian or American law, the appellant urging the application of Canadian law upon a principle sought to be derived from Smith v. Condry, 1 How. 28, 42 U.S. 28, 11 L.Ed. 35. We need not decide it. It would have become important only if the court, determining that both vessels were at fault, also determined that the fault of one contributed in greater degree to the collision than the fault of the other. In such situation § 640 of the Canada Shipping Act 1934 applies the "degree of fault" or comparative rule in assessing damages. 1. "Where by the fault of two or more vessels, damage or loss is caused to one or more of those vessels * * *, the liability to make good the damage or loss shall be in proportion to the degree in which each vessel was at fault."

This rule is, however, subject to the proviso that "(a) If, having regard to all the circumstances of the case, it is not possible to establish different degrees of fault, the liability shall be apportioned equally."

It is conceded that at the time of collision the American and Canadian rules of navigation were substantially identical.

The District Judge concluded from a considered appraisal of the evidence, the wide conflicts therein, the impossibility of satisfactorily resolving such conflicts and the fact that there was nothing in the situation to make safe operation of either vessel difficult, if due care and the rules of navigation had been followed, both vessels were equally at fault and should equally share the damage. This would have been his finding and conclusion if the Canadian Law rather than the American applied. We are unable to perceive error in his findings or conclusions. If either or both ships were where they should not have been in respect to the charted courses it does not excuse either for failure to exercise reasonable precaution or to comply with the rules of navigation, when danger was or should have been apprehended by the Master of each steamer.

The decree below is affirmed.